# Midland Gas Corporation v. Reffitt.

March 14, 1941.

H. H. Ramey and Joe Hobson for appellant.

Combs and Combs for appellee.

OPINION OF THE COURT BY JUDGE FULTON—Affirming.

On June 20, 1930, the appellee, Thomas Reffitt, executed to the appellant, Midland Gas Corporation, an oil and gas lease on 273 acres for a primary term of two years and as much longer as oil or gas was produced in paying quantities from the property. The gas royalty provision was one-eighth of the sale price for all gas sold and marketed from the premises payable monthly

at a rate of not less than one and a half cents per thousand cubic feet. The lease contained this provision:

"Lessee agrees to commence a well on said premises within thirty days from this date, and to diligently prosecute the drilling of the same until completed and as soon as the first well has been completed the lessee agrees to commence the drilling of a second well so as to complete the drilling of two wells within one year from this date, and the lessee agrees to drill a third well on said property within the second year of this lease, provided said property is productive of gas in paying quantities and if said property is productive of gas in paying quantities the lessee agrees to drill said property so as to place a well on each fifty acres contained in said lease, in other words the property shall be understood to be developed when the lessee has drilled a well to each fifty acres."

Two wells productive of gas were completed prior to January 1, 1931, and the gas has been sold to the Kentucky-West Virginia Gas Company under an agreement, made prior to the drilling of the wells, whereby the latter company agreed to purchase all gas produced from the lease. Deliveries of gas from the two wells to the pipe line company were begun in November, 1930, and the gas has since then been delivered to that company.

This action was filed by the appellee against the appellant to recover damages on account of appellant's failure to drill three additional wells, it being alleged in the petition that gas was produced in paying quantities and that therefore it became appellant's duty to drill the additional wells. Appellant, by its pleadings, attempted to excuse itself for its failure to drill additional wells on the ground that gas was not produced in paying quantities and on the further ground that it entered into an agreement with appellee whereby it was released from its obligations to drill any further wells and surrendered to appellee all of the leased premises except the two wells and fifty acres around each well as provided in the lease. The action proceeded as an equitable one and on final trial judgment in behalf of appellee was rendered for quarterly installments of $75 beginning on September 30, 1931, up to and including September 30,

1939, with interest on each quarterly installment from the respective due dates. This judgment, with interest allowances, amounted to approximately $3,000 at the time of its rendition.

It is first contended by appellant that the evidence shows conclusively that gas was not found in paying quantities upon the completion of the first two wells but that, in any event, as it was a question of fact whether gas was found in paying quantities, or whether the productiveness of the property justified further development, its discretion and judgment as lessee must be accepted as conclusive.

The only material evidence on the question as to whether gas was found in paying quantities and as to whether the production of the two wells drilled by appellant justified further development is furnished by H. M. James, an officer of appellant, and by statements incorporated in the evidence by agreement of parties, showing the production of gas from the two wells and from adjoining leases. Mr. James stated that it cost about $10,000 to drill each of the two producing wells and that it would not have paid the appellant to drill further wells on account of the fact that the rock pressure in that field had decreased and on account of other wells in the locality going dry. He further said that he received the information that the Kentucky-West Virginia Gas Company would not receive gas from any other wells that were drilled on the lease because of the fact that that company thought the drilling of further wells would be deleterious to the field. He further testified that additional development of a gas field lessened the rock pressure and that a number of wells on surrounding leases failed and that the rock pressure of this particular lease was lower. It is significant that this witness never stated what the rock pressure on the lease was at any time during the operation although he says that he measured it. It is further significant that no additional testimony is introduced as to decreased rock pressure in the field. The only evidence of this character is contained in some of the statements filed by other oil companies which will be later referred to.

The statements filed by the Kentucky-West Virginia Gas Company as to wells drilled by it during the years 1927-1930 showed that nine of them produced gas and that one was not in paying quantity when completed.

The latter well, however, was drilled before the two wells completed by appellant and the natural assumption is that it knew of this before it commenced operation. One of these ten wells was plugged October 3, 1934. The remaining eight wells produced gas continuously until the statements were filed in the year 1939. A well of the Inland Gas Corporation produced approximately 36,000,000 cubic feet of gas from October 26, 1930, to August 1, 1938, the largest production being approximately 10,000,000 cubic feet in the year 1935—thus, as to this well, an increase, rather than a decrease, in production is shown for five years after appellant drilled its two wells. A well completed by the Carbreath Gas Company in February, 1928, was never connected with a pipe line, the reason not being shown. A well drilled by the Hamilton Gas Corporation in 1926 had an initial flow of 554,000 cubic feet, with an initial rock pressure of 365. This rock pressure had decreased to 118 in the year 1935. But this was at a time when the additional wells should have been completed by appellant if gas was found in paying quantities.

Coming now to the two wells drilled on appellee's lease, we find that the production by years was approximately as follows: 1931—40,000,000 cu. ft.; 1932—40,-000,000 cu. ft.; 1933—32,000,000 cu. ft.; 1934—27,000,000 cu. ft.; 1935—32,000,000 cu. ft.; 1936—29,000,000 cu. ft.; 1937—28,000,000 cu. ft.; the first six months of 1938—15,000,000 cu. ft.

We cannot escape the conclusion that the evidence demonstrates conclusively that gas was found in paying quantities which required the completion by appellant of additional wells called for by the lease. The lease called for the completion of a third well within the second year of the lease if gas was produced in paying quantities. In the second year of the lease there had been no material decrease in production, only a few thousand cubic feet. Even in the year 1932 there was not a great decrease in production. Most of the circumstances relied on by appellant to justify failure of further development were circumstances occurring prior to the drilling of the two wells by it, circumstances which, it is reasonable to presume, were known to appellant when it commenced operations and which did not then deter it from drilling. During the first thirteen months the two wells drilled by appellant produced over 45,000,000 feet of gas which,

at the price of twelve cents per thousand received by appellant for the gas, amounted to $5,400. During the seven and one-half years, according to the table of gas deliveries, appellant produced and marketed approximately 243,000,000 cubic feet for which it received approximately $27,000. It appears to us that the evidence demonstrates conclusively that gas was found in paying quantities and that appellant was therefore called on to drill additional wells.

We are cited by appellant to a number of authorities holding that where it is a question of fact as to whether oil or gas has been found in paying quantities, or whether the productiveness of the property is sufficient to justify further development or operations, the discretion and judgment of the lessee will be accepted as conclusive unless fraud or bad faith is shown. That rule was announced broadly in Warfield Natural Gas Company v. Allen et al., 248 Ky. 646, 59 S. W. (2d) 534, 91 A. L. R. 890. Willis' Thornton on oil and gas, Section 490, was cited as sustaining that rule. The quoted language from the latter authority modifies the broadly stated rule in this language:

"We do not mean an arbitrary judgment, or one springing from an ulterior purpose to get some unfair and dishonest advantage of the land owner, but a judgment arrived at by acting in good faith upon sound business principles."

From the evidence appearing before us, there seems to be little doubt that the judgment of appellant that the productiveness of the lease in controversy was not sufficient to justify further development was an arbitrary judgment, not based upon sound business principles. It might be that if the condition and situation of the lease and the surrounding leases had been considered in the year 1938 from the standpoint of whether or not the lease warranted further development, that a judgment by appellant in the negative could be sustained as being a judgment formed in good faith. But the situation was such in the years 1931, 1932 and 1933, when the additional wells should have been drilled, as to leave no doubt that further development was required in accordance with the terms of the lease.

On the issue raised by the pleadings as to surrender of all but 100 acres of the lease surrounding the two

wells drilled, Mr. James testified that within 90 days after the completion of the second well he had a verbal agreement with appellee as to such surrender and that he later wrote appellee a letter notifying him of the surrender. Appellee flatly denied the verbal agreement and stated that he never received such a letter. Appellee's version was that he tried from time to time to induce Mr. James to drill the remaining wells and that he was put off with excuses. He further stated that Mr. James offered to let him drill the remaining wells and pay for the drilling out of the proceeds of the producing wells and then turn the wells back to appellant. The judgment of the chancellor was necessarily a finding that no surrender of the lease was effected. We do not feel justified in disturbing this finding. Further, since the lease was recorded, it may well be doubted that a surrender could have been made otherwise than by an acknowledgment on the margin of the record or by an instrument assigned and acknowledged by the lessee. Ward v. Tripple State Natural Gas Co., 131 Ky. 711, 115 S. W. 819.

It is further contended for appellant that there was no evidence showing that appellee sustained any damage by failure of further development and that, in any event, the utmost to which appellee was entitled was a judgment for nominal damages. Certain authorities are cited which we do not consider to be in point since they are predicated on the assumption that it did not appear from the evidence that any benefit would have resulted to the lessor from a compliance with the terms of the lease as to development. Here, the two producing wells yielded to appellant approximately $30,000 up to the time of the rendition of the judgment—appellee's royalty on this was approximately $3,750. Had the other three wells been drilled and had they been as productive as the wells actually drilled, appellee would have received in royalty as much again as he actually received. The trial court no doubt took into consideration the fact that had the three wells been drilled none of the five wells would have produced as much as the two wells actually did produce and fixed the damage to appellee as $2,475 with appropriate interest.

It is a difficult matter to determine the amount of damage in an action of this character but this difficulty may not be permitted to deter the court from such a de-

termination where there is evidence from which it can be made with a reasonable degree of certainty. The measure of damages in such cases is the amount of the royalties the lessor would have received had production been marketed, if it can be shown with reasonable certainty that the land would have produced a certain quantity of gas. Carroll Gas & Oil Co. v. Skaggs, 231 Ky. 284, 21 S. W. (2d) 445. Measured by this rule, we are not prepared to say that the finding of the trial court was based upon purely speculative evidence or that the finding was excessive. Even where the lessor marketed no gas from the lease, it was held in the last cited case that the opinions of well informed persons might be used as a basis as to what production would have been. Such expert opinion is not indispensable, however, in a case such as this where the trial court had had before it the records of actual production from the lease for a period of eight years. Taking into consideration the decline in the production from the two wells and from wells on surrounding leases, it appears that the judgment, though ample, was not excessive.

Judgment affirmed.