FLOYD GREEN, DUEY ODUM, ADAM LEE

*v.*

P. R. HENDERSON, *et al.*

(No. 10328)

Submitted September 25, 1951. Decided November 13, 1951.

*Crockett & Tutwiler, J. Strother ·Crockett,* for plaintiff in·error.

*M. E. Boiarsky, Hillis Townsend,* for defendants in error.

Fox, PRESIDENT:

P. R. Henderson, L. E. Groseclose and P. J. Groseclose, partners, trading and doing business as the Sewell Pocahontas Coal Company, hereafter referred to as Sewell Company, leased from Peoples Pittsburgh Trust Company, Trustee, a boundary of coal in McDowell County on which was located at least three openings or mines, from which coal could be mined and marketed, known as mines Nos. 1, 2 and 3. The Sewell Company operated mine No. 1, and this litigation is not in any way related to that operation. About May, 1948, it entered into an arrangement with one Floyd Green by which he was to operate mine No. 2. It seems to have been contemplated that there was to be a written agreement touching the terms and conditions of the contract under which Green was to operate said mine, and a writing was prepared, and there being some objection thereto on the part of Green, the writing was corrected to meet such objection, but for some reason it was never signed. It is admitted, however, that mine No. 2 was afterwards operated by Green, closely following the terms of said unsigned writing. Sometime later one Charles H. Kitchen entered into an oral agreement of the same nature to mine coal from mine No. 3, and he enlisted the aid of his brothers-in-law, Duey Odum and Adam Lee, and they all continued to work in said mine until late in June, 1949. It seems to be agreed that the Kitchen agreement was the same as that

under which Green was operating, and, therefore, the same questions are presented on this writ.

The controversy between the said Green, Odum and Lee on the one hand, and the Sewell Company on the other, grows out of the payment of vacation pay to which Green, Odum and Lee, members of the United Mine Workers of America, claimed to be entitled under a then existing agreement, which is known as the National Bituminous Coal Wage Agreement of 1948, and to which the Sewell Company was a party, providing for vacation pay on the basis of $100.00 per year.

On September 24, 1949, Floyd Green instituted his action against Sewell Company before a justice of the peace of McDowell County, in which he sought to recover $291.60 which he contended covered vacation pay due from him to his employees, and $38.97 due him for coal mined and delivered under his agreement. A like action was instituted by Adam Lee, on the same date, in which the claim was for $83.33 vacation pay to Lee, $66.67 vacation pay claimed to be due employees working in the mine, and $110.10 for coal delivered, or a total of $257.21. In the Duey Odum case there was a claim for the same amount, based on the same claims. Judgments for the defendants were entered by the justice of the peace in each of said actions.

Each of the three cases above mentioned was appealed to the Circuit Court of McDowell County, and by agreement trial had before the judge of that court in lieu of a jury. The sum of $38.97 was tendered to Green, and the sum of $110.10 to Duey Odum, and a like amount to Adam Lee, these amounts being for coal delivered, leaving the balance of the claims to rest upon the question of whether the defendants, in each of the cases, were liable for the vacation pay of the plaintiffs and their employees. The court entered judgments in each of the cases for the full amount of claims in the actions before the justice of the peace, with costs to plaintiffs, including fee of $5.00 to be taxed as costs in each case. The cases were heard togeth-

er in the circuit court, were presented to this Court as one case, and are now heard together, all by agreement of the parties involved.

As indicated above, the questions presented in each case are first, whether the plaintiffs were themselves entitled to vacation pay, as employees of the defendants, and, second, whether the defendants are liable to the plaintiffs for the vacation pay of their employees, as a part of their wages under the National Bituminous Coal Wage Agreement, to be paid to them as employees of the Sewell Company. The contention of the defendant, Sewell Company, is that it is not liable to pay the vacation pay of Green, Odum and Lee, because they were lessees of said mines, supervising and controlling separate businesses from that operated by the Sewell Company, and that the employees of the said Green, Odum and Lee, while entitled to vacation pay, must look to their immediate employers for that pay, and that the Sewell Company is in no wise responsible therefor.

A decision of these contentions requires a study of the terms of the agreement under which the parties operated.

The first and original agreement seems to have been entered into between the Sewell Company and Floyd Green, resulting in the preparation of a writing, intended to embody the agreement, which writing was afterwards corrected to meet the objections of Green to the first paper, but for some unexplained reason never signed. It is clear, however, that the parties operated under an oral agreement. The unsigned writing was not put in evidence, and, therefore, in determining what the contract really was, we must rely upon the testimony of witnesses. From this testimony, we gather that Green agreed to operate mine No. 2, using his own equipment, and furnishing his own labor, and was to be paid $3.50 per ton for coal delivered at the chute, and, as we understand, ready for loading, subject to a provision that this compensation might vary, depending upon the coal market, and it is in evidence that during the course of approximately one

year in which Green operated this mine, the compensation varied from $3.65 per ton to $2.92½ per ton. Green was to employ his own men, and the operation being a small one, the number of men employed averaged five or six. Their wages were $1.72½ per loaded mine car. Green kept the time of these men, and reported to the office of the Sewell Company, and that company kept a separate book account of Green's operation. Green's employees were paid at the Sewell Company mine office, just as the regular employees of that company were paid. By agreement, the Sewell Company paid the required premiums into the Workmen's Compensation Fund, as well as the Unemployment Fund, Social Security, Income Tax Withholding, Burial Fund, Medical Fund and Union Dues which were to be deducted from the wages of the men employed by Green. In making these various payments to the State and Federal Governments, and to others, the men employed by Green were represented to be employees of the Sewell Company. The supervision of the mine proper was entirely in Green's hands, Sewell Company exercising no supervision of the mine or the employment of the men, except that when Green contemplated the employment of a man, he was sent to the office of the Sewell Company where that company referred him to their regular physician for medical tests, and if favorable, Green was authorized to employ the man so examined, and the inference is that if the medical tests proved unsatisfactory, such employment would have been vetoed by the Sewell Company. These, we think, are the undisputed facts surrounding the operation of mine No. 2 by Floyd Green. Mine No. 3 operated by Kitchen, Odum and Lee was operated under the same agreement, employed practically the same number of men, and it is agreed that in all respects, the same questions arise as those growing out of the operation of mine No. 2 by Green.

The National Bituminous Coal Wage Agreement of 1948, binding on the Sewell Company, as well as the plaintiffs, contains this provision:

> "The practice of subcontracting and the hiring of back hands for the mining and loading of coal shall not be permitted. This section shall not prohibit a group of miners working gang work in isolated places where the compensation paid is not less than the prices provided for in this contract."

It is the contention of the plaintiffs that the work they did was gang work, and that being such character of work, it did not change their relation as employees of the Sewell Company; that the fact that the said company, for the purposes of the Workmen's Compensation Fund, Unemployment Fund, Social Security, Income Tax Withholding, Burial Fund, Medical Fund and Union Dues, carried the names of Green and his employees on the Sewell Company's books, and treated them for these purposes as employees of the company; and the further fact that they controlled the employment of men, through medical examinations, clearly shows that it was not intended by any of the parties to the agreements under which the said plaintiffs acted, to change the relations which had theretofore existed between them; and that, therefore, the vacation pay, being a part of the wages which the employees of the mine were entitled to receive, under the National Bituminous Coal Wage Agreement of 1948, there was a clear obligation on the part of Sewell Company, not only to pay the plaintiffs individually their vacation pay, but to pay to the plaintiffs sums sufficient to enable them to pay to their employees the vacation pay to which they were entitled. On the other hand, the contention of the defendant, Sewell Company, is that the agreement between it and the plaintiffs was, in effect, a lease of these mines to them, respectively; and that, while the men employed by the plaintiffs were entitled to vacation pay, the obligation to make such payments rested upon the plaintiffs as lessees; and that the work in which plaintiffs engaged was an independent enterprise from that being carried on by Sewell Company. The question of the amounts due for coal which had been loaded prior to the later part of June, 1949, when the plaintiffs quit working,

is not contested, and the amounts due from that account were tendered by the defendant to the plaintiffs in the circuit court, but not accepted. For that reason, judgments were entered for the full amount of plaintiffs' claims.

The statement of the terms and provisions of the agreement under which plaintiffs acted creates a difficult question of fact which the lower court determined in favor of the plaintiffs. Unquestionably, the agreement contained many of the elements of a lease agreement, or that of an independent contractor. We may conclude that it was not intended as a subcontract, which might make the plaintiffs independent contractors, because the Bituminous Agreement, of which all of the litigants were parties, prohibits that relationship; and we do not think the evidence is sufficient to establish the lease of the coal which the Sewell Company had under its control with the owner. The reasonable solution of the whole controversy was that a relationship, authorized by said Bituminous Agreement, was created, which clearly did not contemplate that the relationship of employer and employee, as between plaintiffs and Sewell Company, would be in anywise changed. We do not think there was any lease made, one reason being that it is not contended that any royalties were to be paid by the plaintiffs. Then again, under the agreement, plaintiffs were required to sell the coal produced by them to the Sewell Company at prevailing prices, although one of the defendants expressed the opinion that plaintiffs might have sold the coal they produced to other parties provided they pay royalties to the defendant, Sewell Company. On the whole, we are of the opinion that the evidence was sufficient to sustain the contention of the plaintiffs that the relationship between plaintiffs and defendants was that of employees and employer, and we are confirmed in this view of the case by the action of the trial court in so holding.

The action of the trial court in finding for the plaintiffs has the same affect in this Court as the finding of a jury, with the approval of that finding by the trial court. We

need not cite authority for that proposition. We cannot say that the judgment of the circuit court was erroneous, or without sufficient evidence to support it, and for that reason we conclude that the same should be affirmed.

The judgment of the Circuit Court of McDowell County, in the three cases here considered, is affirmed.

*Affirmed.*