COTIGA DEVELOPMENT COMPANY

*v.*

UNITED FUEL GAS COMPANY

(No. 12141)

Submitted October 9, 1962.    Decided December 11, 1962.

BERRY, JUDGE, not participating.

*Dechert, Price & Rhoads, Theodore Vorhees, Dayton, Campbell & Love, Harry V. Campbell, Charles M. Love,* for plaintiff in error.

*C. E. Goodwin, Herbert W. Bryan, H. L. Snyder, Jr.,* for defendant in error.

CALHOUN, PRESIDENT:

This case involves an action of assumpsit instituted in the Circuit Court of Kanawha County prior to the effective date of the Rules of Civil Procedure for the recovery of damages in the sum of $450,000 for an alleged breach of three provisions in an oil and gas lease.

After a trial of the case without a jury, the circuit court rendered judgment for the plaintiff, Cotiga Development Company, a corporation (referred to herein as Cotiga), against the defendant, United Fuel Gas Company, a corporation (referred to herein as United Fuel), for the sum of $2,479.78, plus interest and costs. From that judgment Cotiga prosecutes this writ of error. United Fuel has made a cross assignment of error in this Court. That is to say, Cotiga asserts that the trial court should have rendered judgment in its favor for a greater sum; and United Fuel insists that there should have been no recovery of damages whatsoever against it.

Cotiga, a Delaware corporation with its principal offices in Philadelphia, is the owner of various tracts of land in Mingo County, West Virginia, and is also the owner of gas and oil and other mineral rights underlying other tracts of land in that county.

United Fuel, a West Virginia corporation, with its principal offices at Charleston, is a public service corporation en-

gaged in leasing gas and oil producing lands in this state, developing mineral resources therefrom, transporting natural gas through pipe lines to markets for distribution and sale thereof at both wholesale and retail; and other business activities customarily engaged in by similar public utility corporations.

On December 5, 1929, Cotiga, as lessor, entered into an oil and gas lease with Woods Oil and Gas Company (referred to herein as Woods Oil), as lessee, covering 34,519 acres of land in Mingo County. By a writing made and executed one day later, December 6, 1929, Woods Oil assigned the lease, together with four other leases, to United Fuel, "subject to the terms, limitations, rents, royalties, and payments conditioned in the original leases." At the time of the making of the lease and at the time of the assignment thereof, United Fuel was a public utility but Woods Oil was not. The term of the lease was ten years and so long thereafter as gas and oil should be produced from the premises in paying quantities and so long as royalties should be paid. By a written instrument dated January 20, 1933, United Fuel surrendered its rights under the lease as to 23,367.69 acres as of March 3, 1933, leaving 11,151.31 acres which constitute the area since covered by the assignment of the lease to United Fuel. By the terms of the lease and the assignment thereof, United Fuel became obligated to pay to Cotiga annual delay rentals of $11,151.31 or the sum of one dollar for each acre, which sum represents a guaranteed annual minimum. If royalties exceed that sum, Cotiga is entitled to receive the excess, the intent and effect being that Cotiga shall receive at least that sum, "either in the way of royalties or delay rentals" as provided in the lease.

The provisions of the lease which form the basis of the case are paragraph (1), which is referred to in the case as the "royalty covenant"; paragraph (7), which is referred to as the "marketing covenant"; and paragraph (12), which is referred to as the "tax covenant". These several provisions are quoted below.

ROYALTY COVENANT: "(1) Lessee agrees to deliver to the credit of the Lessor, its successors or assigns,

free of cost in the pipe line to which said Lessee may connect its wells, a royalty of the equal one-eighth (1/8) part of all oil produced and saved from the leased premises, and to pay for one-eighth (1/8) of the gas produced from each gas well drilled thereon, from which the gas is marketed, while the same is so marketed, at the rate received by Lessee for such gas, which one-eighth (1/8) shall never be based, however, upon a value of less than twelve (12) cents per thousand cubic feet for said gas; that is to say, the said one-eighth (1/8) royalty shall never be less than one and one-half (1 1/2) cents per thousand cubic feet, such payment to be made on or before the 20th day of the month following that in which the gas is marketed." The trial court held, in accordance with United Fuel's contention, that the wellhead or field price in the area of the leased premises constitutes the proper basis for computation of gas royalties, whereas Cotiga contends that the computation of royalties should be based on the price received by United Fuel for gas when and wherever sold by it.

MARKETING COVENANT: "(7)   If oil or gas is found on the leased premises in paying quantities, the Lessee agrees to proceed with due diligence to develop the same, and market the production therefrom to the end that the Lessor and the Lessee may derive the speediest return practicable for the oil and gas recoverable thereunder, due consideration being always given to the condition of the industry as a whole." The trial court held that United Fuel did not satisfy its obligation to market the gas "to the end that the Lessor and the Lessee may derive the speediest return practicable"; but that the proper measure of damages for such failure is merely interest on the royalties for gas which should have been marketed but which was not actually marketed. The interest was determined to be $2,479.78, which sum represents the amount of the judgment.

Cotiga contends that the proper measure of damages under the marketing clause is royalties based on the sale price which would have been received by United Fuel had it actually marketed gas according to the requirements of the lease.

United Fuel, on the other hand, contends that it is permitted by the lease to exercise a sound discretion in determining the speed with which the gas produced on the premises shall be marketed, "due consideration being always given to the condition of the industry as a whole"; that it has satisfied the requirements of the lease in this respect; and that therefore it is not liable to Cotiga for any damages for failure to market gas. Alternatively, United Fuel contends that, if this Court should determine, as did the trial court, that United Fuel has failed in a duty imposed on it by the lease to market gas from wells on the premises, the proper measure of damages for such failure is interest on the money Cotiga should have received but did not receive as royalties by reason of United Fuel's failure to market gas from the premises in conformity with the requirements of the lease. To support such alternative contention, United Fuel relies on certain language in *Grass* v. *Big Creek Development Co.*, 75 W. Va. 719, 84 S. E. 750.

TAX COVENANT: "(12) Lessee agrees to pay all taxes assessed against the estates hereby leased, and upon all the improvements installed in connection therewith in whosoever name, but not upon the one-eighth (1/8) royalty secured to the Lessor hereunder." Cotiga contends that this provision obligates United Fuel to pay all *ad valorem* taxes assessed against the real estate embraced in the area covered by the lease assignment. The trial court held, in accordance with United Fuel's contention, that the language of the tax covenant obligated Woods Oil to pay only the taxes on the oil and gas leaseholds, and that the words "estates hereby leased" should not be construed to require United Fuel to pay taxes assessed against the fee or the minerals owned by the lessor.

Distinguished counsel representing the respective parties display a reluctance to concede that any of the pertinent provisions of the lease are ambiguous; and yet, as has been pointed out earlier herein, quite divergent constructions are placed on such provisions in briefs filed and oral arguments made in behalf of the two parties.

490

When the language of a written instrument is plain and free from ambiguity, a court must give effect to the intent of the parties as expressed in the language employed and in such circumstances resort may not be had to rules of construction. *Magnus* v. *Halltown Paper Board Co.*, 143 W. Va. 122, pt. 1 syl., 100 S. E. 2d 201. This legal principle has been applied to wills and deeds. *In re Conley,* 122 W. Va. 559, 561, 12 S. E. 2d 49, 50; *Wilcox* v. *Mowrey,* 125 W. Va. 333, 339, 24 S. E. 2d 922, 925; *Spicely* v. *Jones,* 199 Va. 703, 706, 101 S. E. 2d 567, 569; *Mace* v. *Carpenter,* 147 W. Va. 322, (decided October 2, 1962), 127 S. E. 2d 254; *White Flame Coal Co.* v. *Burgess,* 86 W. Va. 16, pt. 6 syl., 102 S. E. 690. "Where the provisions of an insurance policy contract are clear and unambiguous they are not subject to judicial construction or interpretation, but full effect will be given to the plain meaning intended." *Christopher* v. *The United States Life Insurance Co.,* 145 W. Va. 707, pt. 1 syl., 116 S. E. 2d 864. See also *Stone* v. *National Surety Corporation,* 147 W. Va. 83, syl. 125 S. E. 2d 618. Similar principles have been applied in the consideration of statutory and constitutional provisions. *In re Hillcrest Memorial Gardens, Inc.,* 146 W. Va. 337, 119 S. E. 2d 753, 759; *State ex rel. Lambert* v. *Carman,* 145 W. Va. 635, pt. 4 syl., 116 S. E. 2d 265; *State* v. *Jackson,* 145 W. Va. 51, pt. 3 syl., 112 S. E. 2d 452; *State* v. *General Daniel Morgan Post,* 144 W. Va. 137, pt. 5 syl., 107 S. E. 2d 353. In a case involving a mining lease this Court stated: "A valid contract expressing the intent of the parties in unambiguous language will be applied and enforced according to such intent, and without resort to matters extrinsic to such contract." *Babcock Coal & Coke Co.* v. *Brackens Creek Coal Land Co.,* 128 W. Va. 676, pt. 1 syl., 37 S. E. 2d 519. See also *Little Coal Land Co.* v. *Owens-Illinois Glass Co.,* 135 W. Va. 277, 63 S. E. 2d 528. The legal principles referred to above in this paragraph are applicable to the lease involved in this case.

United Fuel is not a sublessee as a result of an independent contract with Woods Oil; but rather it is an assignee of the lease which Woods Oil obtained from Cotiga. *Shearer* v. *United Carbon Co.,* 143 W. Va. 482, 103 S. E. 2d 883. The

rights and obligations of United Fuel and Cotiga in relation to each other are, therefore, measured by and must be determined by the terms of the lease. Cotiga's rights and obligations remain the same and United Fuel, by the assignment, merely succeeded to the rights and obligations of Woods Oil under the lease. 58 C.J.S., Mines and Minerals, Section 220c, pages 563-568; 51 C.J.S., Landlord and Tenant, Section 44, page 566; *Bankers Pocahontas Coal Co. v. Monarch Smokeless Coal Co.*, 123 W. Va. 53, 14 S. E. 2d 922; *Stiles v. Schaffner*, 119 W. Va. 424, 194 S. E. 436; *Comley v. Ford*, 65 W. Va. 429, 64 S. E. 447.

Cotiga's complaint is not predicated on a failure to drill wells but rather it is predicated on a failure to market gas from wells which have been drilled. At the time of the institution of the action there were twenty-four producing wells on the premises. Sixteen of these were drilled by United Fuel. The remaining eight were drilled by third persons to whom United Fuel had subleased portions of the premises and from whom it has purchased all gas under the terms of certain gas purchase contracts. It was proved at the trial that, whereas the eight wells were kept on line by United Fuel for three hundred sixty days a year, the sixteen United Fuel wells were closed an average of one-third of the time. The trial court ruled that the marketing covenant required United Fuel to keep its sixteen wells on line three hundred sixty days a year and accepted Cotiga's proof that the resulting loss of production and marketing amount to 957,779,000 cubic feet. The trial court, as has been stated earlier herein, declined to allow royalties for such gas at the rate specified by the lease in accordance with Cotiga's contention; but, on the contrary, allowed only interest on the sum of money which the trial court found that Cotiga should have received as royalties on the wellhead or field price thereof under the terms of the lease for the gas which United Fuel should have marketed but did not market.

Inasmuch as the amount of the damages to which Cotiga is entitled, if any, under the marketing covenant depends upon a determination whether such damages are computed on the wellhead price or the price received by United Fuel

492

for such gas when marketed by it, we will proceed first to consider the questions arising in relation to the royalty covenant which obligated Woods Oil, the lessee, "to pay for one-eighth (1/8) of the gas produced from each gas well drilled thereon, from which gas is marketed, while the same is so marketed, *at the rate received by Lessee for such gas,* * * *." (Italics supplied). For its contention that the lease contemplates computation of the one-eighth royalty on the basis of the amount received by United Fuel for such gas when and wherever sold by it, as distinguished from the wellhead or field price, Cotiga places primary reliance on the phrase, "at the rate received by Lessee for such gas."

Late in the nineteen forties, United Fuel commenced production of gas from wells drilled on the leasehold premises and to supply to Cotiga data on the metered production from such wells. These periodic accounting data disclosed the total production for the several quarters involved, the royalty rate and the earned royalties on the reported production. The royalty rate was always based on the market price of gas at the wellhead in the area covered by the lease. Cotiga knowingly accepted regular periodic payments thus computed on the wellhead price of gas, apparently without protest, until about the time of the institution of the action of assumpsit in 1958. At that time Cotiga insisted and has since continued to insist that the proper basis for computation of royalties is not the wellhead price, but rather that such royalties should be computed on the basis of the price received by United Fuel for such gas when sold after having been commingled with gas from other sources and transported to the various points of sale.

We believe and therefore hold that the words "at the rate received by the Lessee for such gas", convey a clearly expressed and unambiguous meaning and, in conformity with well-settled legal principles referred to previously herein, the Court is not at liberty to construe or interpret such language, but, on the contrary, must apply it in accordance with the intent of the parties clearly expressed therein. It is not for us to say whether this provision is wise or unwise, reasonable or unreasonable, usual or unusual. In the absence

of ambiguity we cannot be swayed by a persuasive argument that the intent expressed by such language may produce a harsh result. So long as an otherwise valid contract does not contravene some principle of law or public policy, it must stand and become operative as the deliberate act of the parties. 17 C.J.S., Contracts, Section 296, pages 702-707. It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as plainly expressed in their written contract or to make a new and different contract for them. *Bischoff* v. *Francesca,* 133 W. Va. 474, 482, 56 S. E. 2d 865, 870; *Lange & Crist Box & Lumber Co.* v. *Haught,* 132 W. Va. 530, 538, 52 S. E. 2d 695, 699; *Kanawha Banking & Trust Co.* v. *Gilbert,* 131 W. Va. 88, 109, 46 S. E. 2d 225, 236; 17 C.J.S., Contracts, Section 296, page 702; 12 Am. Jur., Contracts, Section 228, page 749.

United Fuel contends that the wellhead price must have been in the contemplation of the parties to the lease because Woods Oil, the lessee, was not a public utility. Perhaps a sufficient, succinct answer to that contention is that if the parties had desired to do so, they could so easily have said that royalties were to be computed on the basis of the wellhead price. It is obvious from this case that such is not an unusual provision in gas leases. No such restriction appears in the rather embracive language used, and we cannot interpolate such a restriction in the plain language employed by the parties themselves.

The lease provided: "All the terms, grants, conditions and provisions of this lease shall extend to and be binding upon *the successors and assigns of the parties hereto."* (Italics supplied.) It must have been within the contemplation of the contracting parties, therefore, that Woods Oil had the legal right to assign its rights under the lease to another, including a public utility, and that such an assignment was a possibility, even if not a probability. The parties to the lease placed no restrictive language therein to make it operate differently in the event of the happening of such a contingency. As has been observed previously herein, the assignment of the lease could not operate to accomplish any diminution or other alteration of the rights of

Cotiga under the terms of the lease. As a result of the lease assignment, United Fuel succeeded to only such rights as accrued to Woods Oil by the terms of the lease and thereby became burdened by all restrictions and obligations thereby imposed upon Woods Oil. The mere fact that eventually a public utility became the assignee did not alter the terms of the lease or the rights of the lessor thereunder.

To all intents and purposes, United Fuel became the lessee in the place and stead of Woods Oil and was dealt with and treated by Cotiga as such. United Fuel took the assignment with its incidental benefits with its eyes open and was thereby charged with full knowledge that the lease, in plain, unqualified terms and without any restriction or qualification, required the payment of gas royalties to the lessor "at the rate received by the Lessee for such gas." The lease does not say that the basis of computation shall be different in the event of an assignment by the lessor to a public utility, and this Court does not deem itself warranted by reason or authorized by law to read such a restriction or qualification into the plain language by which the parties to the lease set forth the terms of their respective contractural rights and obligations. It may very well be that a determination of "the rate received" by United Fuel will be difficult in view of the commingling of Cotiga's gas with other gas and in view of the fact that United Fuel occupies the status of a public service corporation; but any difficulty or hardship of this nature cannot serve to alter the plain provisions of the lease.

In support of its contention that the lease requires that royalties be computed on the basis of the wellhead or field price, United Fuel contends that the parties so construed the lease by their conduct in paying and accepting payment on such basis over a period of years and that, therefore, such construction is binding upon them. The rule relating to practical construction by conduct of the parties, like other rules of construction, may be employed only in case of ambiguity and may not be employed to change the effect of clear and unambiguous language. *Fredeking* v. *Grimmett*, 140 W. Va. 745, pt. 1 syl., 86 S. E. 2d 554; *Babcock Coal &*

*Coke Co.* v. *Brackens Creek Coal Land Co.,* 128 W. Va. 676, 681, 37 S. E. 2d 519, 522; *Rhodes Cemetery Assn.* v. *Miller,* 122 W. Va. 139, pt. 1 syl., 7 S. E. 2d 659; *Summit Coal Co.* v. *Raleigh Smokeless Fuel Co.,* 99 W. Va. 11, pt. 1 syl., 128 S. E. 298; *Holdred Collieries of W. Va.* v. *Boone County Coal Corp.,* 97 W. Va. 109, pt. 4 syl., 124 S. E. 493; *Blake* v. *Hedrick,* 94 W. Va. 761, pt. 4 syl., 120 S. E. 906; *Butler* v. *Carlyle,* 84 W. Va. 753, pt. 1 syl., 100 S. E. 736; *Myers* v. *Carnahan,* 61 W. Va. 414, pt. 1 syl., 57 S. E. 134; *Gibney* v. *Fitzsimmons,* 45 W. Va. 334, pts. 1 and 3 syl., 32 S. E. 189. "An oil and gas lease which is clear in its provisions and free from ambiguity, either latent or patent, should be considered on the basis of its express provisions and is not subject to a practical construction by the parties." *Little Coal Land Co.* v. *Owens-Illinois Glass Co.,* 135 W. Va. 277, pt. 3 syl., 63 S. E. 2d 528. In 51 C.J.S., Landlord and Tenant, Section 232k, page 858, it is stated that "the construction put on a lease by the parties cannot control the express unambiguous provisions of the instrument itself." "The rule permitting a consideration of the practical construction of a contract by the conduct of the parties may be applied when the language of the contract is ambiguous, uncertain, indefinite, obscure, equivocal, or not clear, so that there is doubt as to the meaning and proper construction thereof, and only when such is the case, * * *." 17 C.J.S., Contracts, Section 325, pages 757-760. "The rule of practical construction by acts of the parties applies only where the contract on its face is ambiguous and uncertain, and not where by its terms the instrument expresses their intention with reasonable certainty." *Salisbury* v. *Brooks,* 81 W. Va. 233, pt. 2 syl., 94 S. E. 117; *Alderson* v. *Gauley Fuel Co.,* 116 W. Va. 95, pt. 1 syl., 178 S. E. 626. See also *Petty* v. *United Fuel Gas Co.,* 76 W. Va. 268, pt. 1 syl., 85 S. E. 523; *Watson* v. *Buckhannon River Coal Co.,* 95 W. Va. 164, pt. 2 syl., 120 S. E. 390.

United Fuel contends that at the time of the making of the lease the universal custom of the natural gas industry in the Appalachian region was to base payments on all open end royalty clauses in gas leases on the wellhead price of gas; that the parties to the lease were charged with knowledge of this universal custom; that therefore it must have been

within the contemplation of the parties when the lease was made; and that this custom should be employed by the Court in supplying the omission of the lease to state expressly the intent of the parties in this respect. We are unable to accede to and adopt that contention as it relates to this case.

Assuming that the alleged usage and custom with all requisite elements has been established in accordance with the rather stringent requirements of law, we believe that the present situation is not one which calls for or would permit an application of that rule. Usage and custom sufficiently established with all requisite elements may be resorted to as a means of construction where a written contract is rendered ambiguous either by reason of the language employed or where the language employed omits to express the obvious intent of the parties. That is to say, the rule may be applied in order to clarify an ambiguity or to supply an obvious omission to express the intent of the parties; but it can never be resorted to where the parties have expressed their intent in clear language on the assumption that they intended something not expressed. Courts are not permitted to employ such rule of construction where the language is unambiguous in order to make a contract which differs from that which the parties have made for themselves.

"Usage may be resorted to 'in order to make definite what is uncertain, clear up what is doubtful, or annex incidents, but not to vary or contradict the terms of a contract.'" *Standard Oil Co. v. Wright Oil Service Co.* (W.Va.), 26 F. 2d 895, 898. "A custom or usage is not allowed to control or vary the meaning of words, when they have a definite legal signification * * *. But if they are uncertain or have not a fixed legal signification, a particular custom may be proved as having been within the knowledge of the parties at the time and impliedly adopted as a part of the contract." *Hall v. The Philadelphia Co.*, 72 W. Va. 573, 578, 78 S. E. 755, 757-58. "Generally speaking, proof of a usage or custom is justified only when there is ambiguity or uncertainty upon the face of a written contract, arising out of the terms used, and can be used only to the extent of clearing up obscurity. Evidence of custom or usage is inadmissible to add new stipu-

lations to, or engraft them upon, an agreement upon its face complete, where the agreement, as it stands, is plain and unambiguous. A custom or usage ordinarily cannot be proved to add something not within the reasonable meaning of the language of the contract or to supplement an apparently complete contract." 55 Am. Jur., Usages and Customs, Section 29, pages 289-90. "Oral testimony of the general usages of the gas business, which must have been in the minds of the parties at the time of entering into the contract, is admissible *to explain an ambiguity* in a written contract for the purchase of gas, whether the ambiguity be latent or patent." (Italics supplied.) *Bell* v. *Wayne United Gas Co.*, 116 W. Va. 280, pt. 2 syl., 181 S. E. 609. "Undefined rights" granted in a coal lease may authorize resort to the rule of construction now under consideration. *Beech Fork Coal Co.* v. *Pocahontas Corporation*, 109 W. Va. 39, pt. 3 syl., 152 S. E. 785. The clear language of the lease here being considered cannot be altered, qualified, restricted or caused to convey a meaning at variance with that therein expressed by the parties by a resort to the rule of practical construction by conduct of parties.

Turning now to the "marketing covenant", as has been previously stated herein, the lease requires the lessee "to proceed with due diligence to * * * market the production * * * to the end that the Lessor and the Lessee may derive the speediest return practicable for the * * * gas recoverable thereunder, due consideration being always given to the condition of the industry as a whole." In his book entitled The Law of Coal, Oil and Gas in West Virginia and Virginia, Section 108, Judge Robert T. Donley, a distinguished former member of this Court, makes the following statement in relation to the diligence required of the lessee: "Two factors are involved in the requirement, whether express or implied, that the mineral resources of the lessor shall be developed with reasonable diligence: (1) the desire of the lessor to convert his subterranean assets into cash and not to be unduly delayed in the process; (2) the possibility of loss by drainage through adjacent or neighboring lands. The second of these has entered the more frequently into the decisions of the cases, * * *." The element of drain-

age appears not to be a consideration in the present case, but the plaintiff's case is rather predicated on its desire to convert its gas into cash pursuant to the terms of the lease and not to be unduly delayed in the process.

The trial court, as is disclosed by a written opinion which was made a part of the record, observed that the "controlling factor" as to this phase of the case is the fact that as to that part of the premises subleased by United Fuel, it kept the eight wells on line and in production for three hundred sixty days in each of the years in question; and the trial court further stated that, "I do not believe that it should have one rule for its sub-lessees and another rule for the lessor of the lease." The trial judge thereafter observed, "If it were not for the fact that the sub-lessees' wells were continuously in the line, it may be that a different rule would be applicable here. However, I do not believe it is necessary to determine that question in this case." It is obvious, therefore, that the distinguished trial judge was not undertaking to formulate a rule which should be applied in every situation of a similar nature. The trial court found from the evidence that, had all the wells been kept on line three hundred sixty days during each of the years in question (1951-58, inclusive), there would have been paid to Cotiga, based on a wellhead price computation, the sum of $81,-600.87; and that the sum actually paid during that period was $72,609.94, leaving an unpaid difference of $8,990.93. Damages were fixed at six per cent on that difference during the period in question, amounting to $2,479.78, for which sum judgment was entered as has been stated previously.

We cannot say that the trial court was clearly wrong in its finding that United Fuel unduly delayed marketing gas from wells on the leasehold premises, in the circumstances of this particular case, nor can we say that the trial court was clearly wrong in its finding from the evidence in relation to the number of cubic feet of gas which would have been marketed but for the dereliction. The proof sustains the obvious proposition that the market demand for natural gas for space heating purposes is seasonal, the demand being much greater in winter than in summer, resulting in a situation

which is characterized as a "peak-and-valley" pattern. United Fuel insists that this factor was obviously in the contemplation of the parties when they provided in the lease that in the development of the leasehold and in the marketing of the production due consideration always should be given to the "condition of the industry as a whole".

The "peak-and-valley" factor is constant in the sense that it continues year after year and in that sense it is not a variable factor. There was no showing that the failure to market in accordance with the "condition" of the industry resulted from any unusual lack of market or from any unfavorable market price during the period in question. By affirming the trial court in this respect, we do not want to be understood as formulating a general rule for application in all situations of a similar nature. We recognize that the lessee in a mineral lease must be accorded a reasonable discretion in the rate of development, production and marketing (*Trimble* v. *Hope Natural Gas Co.*, 117 W. Va. 650, pt. 1 syl., 187 S. E. 331), and that a utility company must reasonably be expected to maintain reserves of gas. We affirm the actions of the circuit court in this respect merely in relation to the facts and situations of this particular case. "The finding of a trial court upon facts submitted to it in lieu of a jury will be given the same weight as the verdict of a jury and will not be disturbed by an appellate court unless the evidence plainly and decidedly preponderates against such finding." *Daugherty* v. *Ellis*, 142 W. Va. 340, pt. 6 syl., 97 S. E. 2d 33; *Edwards* v. *Hylbert*, 146 W. Va. 1, pt. 3 syl., 118 S. E. 2d 347; *Green* v. *Henderson*, 136 W. Va. 329, syl., 67 S. E. 2d 554; *Watkins* v. *Norfolk & Western Ry. Co.*, 125 W. Va. 159, syl., 23 S. E. 2d 621.

We cannot agree, however, that the trial court was correct in its holding as a proposition of law that mere interest is the proper measure of the damages sustained by Cotiga, though it is readily conceded that the trial court had some basis for that holding in view of certain language contained in the opinion in *Grass* v. *Big Creek Development Co.*, 75 W. Va. 719, 84 S. E. 750, to which reference will be made subsequently herein. It is difficult to discern from the rela-

tively few decisions of appellate courts any clear-cut rule or rules by which a trial court may be guided in such a situation. A brief review of decisions by other appellate courts in similar or analagous cases may be helpful. In doing so, we bear in mind that this is not a case involving a claim for damages for drainage. In such a situation, the gas or oil is completely lost to the lessor and the measure of damage is the "diminution of the royalties by reason of such drainage * * *." *Steele* v. *American Oil Development Co.*, 80 W. Va. 206, pt. 2 syl., 92 S. E. 410. See also *Blair* v. *Clear Creek Oil & Gas Co.*, 148 Ark. 301, 230 S. W. 286; *Culbertson* v. *Iola Portland Cement Co.*, 87 Kan. 529, 125 P. 81; *Carroll Gas & Oil Co.* v. *Skaggs*, 231 Ky. 284, 21 S. W. 2d 445; *Ross* v. *Damm*, 278 Mich. 388, 270 N. W. 722; *Junction Oil & Gas Co.* v. *Pratt*, 99 Okla. 14, 225 P. 717; *Sinclair Oil & Gas Co.* v. *Bryan* (Tex. Civ. App.), 291 S. W. 692. Cases of this nature are clearly distinguishable from the present situation because in the present case the gas is still in place, and has not been lost to Cotiga. Such distinction has been made by this Court previously. *Grass* v. *Big Creek Development Co.*, 75 W. Va. 719, 730-31, 84 S. E. 750, 754.

The royalty rule, substantially as contended for by Cotiga, has been approved in Illinois. *Daughtetee* v. *Ohio Oil Co.*, 263 Ill. 518, 105 N. E. 308. The Illinois royalty rule thus announced was considered and disapproved by this Court on the ground that such a rule would result in double payment of royalties to the lessor. *Grass* v. *Big Creek Development Co.*, 75 W. Va. 719, 84 S. E. 750. The royalty rule has been approved and applied in Kentucky with one qualification: an oil and gas lessor must first make a demand upon the lessee to develop and market the oil or gas and liability for payment of royalties is not retroactive but accrues only upon such demand. *Midland Gas Corp.* v. *Reffitt*, 286 Ky. 11, 149 S. W. 2d 537; *Monarch Oil, Gas & Coal Co.* v. *Richardson*, 124 Ky. 602, 99 S. W. 668; *Rowe* v. *Ashland Oil & Refining Co.* (Ky.), 240 S. W. 2d 61. In a Texas case the court indicated that the royalty rule would be applied in an action against the lessee for failure to develop oil and gas in accordance with the terms of the lease, but the court also suggested that credit should be given to the lessee for royalties

thus paid when the mineral is actually produced and marketed. *Texas Pac. Coal & Oil Co.* v. *Barker,* 117 Tex. 418, 6 S. W. 2d 1031. We find no case from any jurisdiction supporting the interest rule applied by the circuit court unless it be *Grass* v. *Big Creek Development Co.,* 75 W. Va. 719, 84 S. E. 750, which formed the basis of the circuit court's decision. A careful consideration of that case is therefore in order.

The *Grass* case, so far as it is pertinent to our present inquiry, involved an action by the lessors against the assignee of an oil and gas lease for breach of an implied covenant requiring reasonable diligence on the part of the lessee in the prosecution of developments necessary for the extraction of oil from the leased premises. Unlike the present case, it was not based on an alleged failure properly to produce and market the oil from wells already in operation but rather on an alleged failure properly to drill additional wells so as to accelerate the extraction and marketing of the oil. In response to a special interrogatory, the jury found that the defendant was remiss in the performance of its duties under the implied covenant but that the jury was unable to determine the number of barrels of oil which would have been produced except for the defendant's failure of performance. The jury nevertheless returned a verdict against the defendant in the sum of $7,000. This Court reversed the judgment of the trial court on the ground that there was not sufficient evidence in the case to support such a verdict, the amount thereof being based only on speculation. The Court remanded the case for a new trial "to be governed by the principles herein announced." In the opinion the Court stated that "it would be grossly unfair to permit recovery of damages to the extent allowed by the jury in this case." In discussing the proper measure of damages, as has been stated earlier herein, the Court rejected the Illinois royalty rule on the ground that such rule would permit the lessor "to receive twice the sum fixed by the contract as compensation for right of exploration" on the premises covered by the lease. The sixth point of the syllabus points out that the lessee must, if oil or gas is found in paying quantities "exercise due and reasonable diligence in prosecuting operations

thereunder for the mutual benefit of himself and his lessor; and if he unreasonably fails or refuses so to do, *damages* therefor are recoverable against him in an appropriate action at law." (Italics supplied.) Nothing in the syllabus furnishes a more precise guide for measurement of damages than the words, "damages therefor". At one place in the opinion the Court stated: "Plaintiffs assumed the burden of showing, by competent proof, *the extent of the injury to them* resulting from delay in drilling under the implied provisions of the lease. \* \* \* Not a word spoken by them, or by any other witness, tends in the slightest degree to show they *suffered any damage* from operations deferred. So far as disclosed, they have lost *nothing more than interest* on the value of productions obtainable. \* \* \*." (Italics supplied.) It is clear enough that the Court considered and disavowed the Illinois rule which is referred to in this case as the royalty rule. Beyond that, there is uncertainty. No precedent or authority is cited for the interest rule. The Court did not state clearly that interest should furnish the proper measure of damages. It merely said that the lessors lost nothing "more" than interest. Nothing of that sort was embodied in the syllabus. The most we can glean with certainty from the *Grass* case is that the lessor is, in a proper case, entitled to recover "damages" for the loss sustained by him and that he should not be permitted to have double payment of the royalties provided for in the lease. In all of that we readily concur. But we do believe that the Court in the *Grass* case failed to spell out precisely and in unmistakable language the proper measure of damages recoverable in such a situation.

Freely recognizing the difficulty of formulating a rule for the proper measure of damages in cases of this nature, in the light of the comparative paucity of precedents available for guidance, and recognizing also that a lessor suffering damages in such a situation should be compensated for such loss but only once, it is our judgment that the fairest and most equitable rule is the one suggested by the Texas case previously referred to herein. The Court accordingly holds that Cotiga is entitled to recover from United Fuel royalties on the gas which should have been marketed from the lease-

hold during the period in question computed on "the rate received" by United Fuel; but that United Fuel shall have the right to offset and take credit for such sum, dollar for dollar rather than on a cubic foot basis, in the settlement and payment for royalties for gas next thereafter marketed from the leased premises. That is to say, damages thus computed in this case shall be deemed *pro tanto* the equivalent of the payment in advance of royalties on gas not actually produced and marketed from the premises, and United Fuel shall be entitled to credit for such sum, dollar for dollar, without interest thereon, when such gas shall be actually produced and marketed at the "rate received" by United Fuel when such gas is ultimately extracted and marketed.

In order to facilitate a discussion of the tax covenant, we quote again the provisions of the lease which embody such covenant, supplying emphasis to the portion thereof which furnishes the chief basis of disagreement between the parties: "Lessee agrees to pay *all taxes assessed against the estates hereby leased,* and upon all the improvments installed in connection therewith in whosoever name, but not upon the one-eighth (1/8) royalty secured to the Lessor hereunder." Cotiga contends that this provision is clear and unambiguous and requires United Fuel to pay all taxes assessed against the fee and mineral rights in the demised premises. The trial court, in accordance with United Fuel's contention, held that this provision means that the taxes on the oil and gas leasehold are to be paid by the lessee but that "the word 'estates' was not meant to include the fee or mineral assessments of the lessor."

It was stipulated that Cotiga has paid the real estate taxes assessed against it with respect to the demised premises during the ten-year period (1948-58) covered by Cotiga's claim; that taxes paid during that period by Cotiga amounted to $69,498.29; and that no demand for reimbursement was made until 1958. In the meantime United Fuel paid all taxes on its leasehold interest in the leased premises, including its improvements placed thereon. United Fuel contends that the tax covenant is ambiguous and that the parties are bound by the construction which by their conduct they have

placed on the provision. In its written opinion the trial court stated: "Moreover, if the language in numbered paragraph (12) of the lease, may be said to be ambiguous, the parties by their actions for a period of twenty-nine years construed the lease so as not to impose an obligation upon the lessee to pay the lessor's real estate taxes."

Code, 1923, Chapter 72, Section 20, provided that a covenant by a lessee in a deed of lease to " 'pay the taxes,' shall have the effect of a covenant that all taxes, levies, and assessments upon the demised premises, or upon the lessor on account thereof, shall be paid by the lessee or those claiming under him." See also Code, 1931, 36-4-10. Had the lease contained a mere covenant "to pay the taxes" without more and without qualifying language, the force of the statute might have obviated any possible ambiguity. But, as counsel for United Fuel have pointed out, instead of using the four simple words of the statute, the parties inserted thirty-five words in the lease in relation to the payment of taxes. We must assume that the parties were cognizant of the statute and it is reasonable to conclude, therefore, that they intended the language used in the lease to accomplish a result different from that provided for in the statute. When the parties used the word "estates" in its plural form, followed by the descriptive words "hereby leased", it is not clear whether they referred to the leasehold interest in both oil and gas; the leasehold interest in the various tracts of land covered by the leasehold; or that the word was intended to convey some other sort of meaning. We agree with the trial judge that the tax covenant is ambiguous; and, in conformity with legal principles stated and authorities cited previously herein, the Court holds that the parties are bound by the construction which they by their actions and conduct have placed on that ambiguous provision over a period of many years.

For the reasons stated, the judgment of the circuit court is affirmed to the extent that it held that United Fuel was in default in performance of the marketing covenant; in its determination of the amount of gas which should have been marketed but for such default; and in holding that the par-

ties are bound by the construction which they, by their actions and conduct, have placed on the tax covenant over a period of years.

· The judgment of the circuit court is reversed in its holding that royalties payable to Cotiga should be computed on the basis of the wellhead price rather than upon the basis of "the rate received" by United Fuel for gas produced on the premises covered by the lease; and that judgment is also reversed in its holding that interest on royalties is a proper measure of damage accruing to Cotiga by reason of United Fuel's failure to market gas from the premises as required by the terms of the lease; and the case is remanded to the Circuit Court of Kanawha County for a new trial in accordance with principles herein adjudicated.

*Affirmed in part;*
*reversed in part;*
*remanded with directions.*