# CHARLESTON.

CARNEGIE NATURAL GAS Co. *v.* SOUTH PENN OIL Co.

Submitted September 9, 1904—Decided December 6, 1904.

1. CONTRACT—*Construction of Agreemnet.*

When a contract is made for the accomplishment of one main purpose, as is usually the case, it is necessarily the purpose of both parties, the thing upon which their minds met and as to which they are in perfect accord, and every provision of the instrument must be read in the light of such purpose. In other words, the whole instrument must be considered in seeking its true meaning. (p. 408).

2. CONTRACT.—*Construction of Words Used.*

Words and expressions in common use are to be taken in their natural, plain, obvious and ordinary significations, unless a contrary intention clearly appears from the context of the contract. (p. 412).

3. CONTRACT—*Construction of Words and Clauses in Contract.*

No word or clause in a contract is to be treated as a redun-

dancy, if any meaning reasonable and consistent with other parts can be given to it.  9 Cyc. 583.·  (p. 412).

4.  CONTRACT—*Option.*

Carnahan being the owner of a number of oil and gas leases, covering a large tract of land, assigned all the gas and gas rights, to which he was entitled by virtue of them, to another party by a written contract, retaining all the oil and oil rights, and, at the same time, entered into another contract with the assignee, containing this clause:  "The parties hereto shall have the right to operate said territory under their respective interests, and should Carnahan in his operations for oil develop a gas well or wells, the Gas Company shall have the right or *privlege* of having any such well or wells transferred  to  it upon payment of the actual cost of drilling the same, together with the cost of the rig and casing, and should the Gas Company in its operations for Gas develop and oil well or wells, Carnahan shall have the right or privilege of having any such well or wells transferred to him upon paymemnt of the actual cost of drilling the same, together with the cost of the rig and casing.  Each party shall have Thirty (30) days from the completion of any such well or wells in which to exercise its option to so purchase a well from the other and make payment therefor, and during which time they shall have the *opertunity* of testing and inspecting any such well drilled by the other. Any Gas Well drilled by Carnahan, and any oil well drilled by the Gas Company which shall not be so purchased by the other party within the time above designated, shall together with the product thereof, be and become the absolute property of the party drilling the same.  Either shall give immediate notice to the other of the completion of any well in which the other would have an interest or right to purchase under this paragraph."  *Held:*  That upon the development of gas in paying quantities, in drilling for oil, and the election of the gas company within the time limited to pay the cost of drilling the well and of the rig and casing, the party drilling it must deliver possession of the well to the gas company, and cannot continue operations therein in an effort to find oil in a lower stratum.  (p. 414).

5.  EXECUTORY ·CONTRACT.

Such election, on the part of the gas company, converts the option into an executory contract, specific performance of which will be enforced in equity.  (p. 414).

6.  INJUNCTION—*Gas Companies.*

Pending the suit for such enforcement, further operations in violation of the contract will be enjoined, to maintain the *status quo,* and obedience to the final decree may be compelled

by prohibitory or mandatory injunction, or both, according to·
the exigencies of the case.   (p. 415).

Appeal from Circuit Court, Wetzel County.

Bill by the Carnegie Natural Gas Company against the South
Penn Oil Company and others.   Decree for defendants, and'
plaintiff appeals.

*Reversed.*

Hall & Hall and H. M. Russell, for appellant.

R. F. & A. B. Fleming, T. P. Jacobs, and U. N. Arnett,.
Jr., for appellees.

Poffenbarger, President:

This case involves the rights of separate owners of the oil and
gas in the same tract of land, as determined, not by principles·
of law governing the rights of separate owners of adjacent or
superjacent strata, but by a contract, entered into by them pre-
sumably to enable both to develop their territory and take out
the substances belonging to them in the most practical, economi-
cal and advantageous manner.

J. E. Carnahan, being the owner of thirty-seven oil and gas
leases on lands in Wetzel and Doddridge counties, entered into
two contracts with the Carnegie Natural Gas Company, on the
23rd day of October, 1899.   By the first, he sold, transferred
and set over to said company, its successors and assigns, in
consideration of. one dollar, the gas and gas rights in said leases
together with all his "estate, right, title, interest and· privilege
in and to the gas and gas rights" in the land described in the
leases.   This left in Carnahan the title to the oil in the same
land. · By the other contract, made on the same day, and, no
doubt, a part of the same transaction, he and the Carnegie Gas
Company, determined the rules which should govern their re-
spective rights and powers, while. operating in the territory, the·
former for oil and the latter for gas.

By the first clause, the gas company bound itself to com-
mence a well on a certain tract, within sixty days from the date·
of the agreement, and drill the same with due diligence "through
the Gordon Sand, unless oil or gas be found in paying quantities·
at a lesser depth."   Should this well prove to be a good pro--

ducer of either oil or gas, as determined by certain standards fixed by the contract, a second one on another part of the territory included in the leases, covering nearly three thousand acres of land, was to be put down in like manner by the gas company; and if it should come up to the same standard, a third well was to be drilled, and upon its measuring up to the requirements in production, a fourth one was to be drilled. These four wells were dealt with specially by the terms of the contract. Whether any terms used in reference to them shall be allowed to fix the meaning of the terms used in the clause, relating to the general development of the territory by both owners, will be discussed later on.

That clause reads as follows: "The parties hereto shall have the right to operate said territory under their respective interests, and should Carnahan in his operations for oil develop a gas well or wells, the Gas Company shall have the right or *privlege* of having any such well or wells transferred to it upon payment of the actual cost of drilling the same, together with the cost of the rig and casing, and should the Gas Company in its operations for gas develop an oil well or wells, Carnahan shall have the right or privilege of having any such well or wells transferred to him upon the payment of the actual cost of drilling the same, together with the cost of the rig and casing.

"Each party shall have Thirty (30) days from the completion of any such well or wells in which to exercise its option to so purchase a well from the other and make payment therefor, and during which time they shall have the *opertunity* of testing and inspecting any such well drilled by the other.

"Any Gas Well drilled by Carnahan, and any oil well drilled by the Gas Company which shall not be so purchased by the other party within the time above designated, shall together with the product thereof, be and become the absolute property of the party drilling the same.

"Either shall give immediate notice to the other of the completion of any well in which the other would have an interest or right to purchase under this paragraph."

Carnahan, on the 14th day of February, 1902, conveyed all the interest and estate vested in him by these leases, to the South Penn Oil Company. L. G. Robinson and others, having acquired some interest in them, joined in the conveyance. Both companies then proceeded with the work of development under

. the contract, each turning over to the other productive wells
pursuant to the agreement, until the South Penn Company
drilled a large gas producing well, known as "Genine-Robinson
No. 19." Upon striking the gas, the workmen withdrew their
tools and notified the gas company, but, soon after the agents
of that company appeared upon the ground, the gas company
was informed, by the agents of the South Penn Company, that
the latter intended to drill the well on down into the oil-bear-
ing stratum and would not then surrender it. Another large
gas producing well, known as "Die No. 1," was drilled by the
South Penn Oil Company, and this, it decided to drill deeper
and refused to surrender to the gas company. Thereupon the
Carnegie Company instituted two suits in chancery against
the South Penn Company, setting out in its bills in detail the
facts hereinbefore substantially given and praying injunctions.
As to the Genine-Robinson well, the prayer is that the South
Penn Oil Company, its agents, and employees be restrained and
inhibited from, in any manner, interferring with the plaintiff
in its works and effort to pack said well for the purpose of sav-
ing the gas, and that the plaintiff may be protected in its peace-
able.posession thereof. As to the Die Well, the prayer is that
the defendant be restrained from drilling said well any deeper
and that it be required and compelled either to close and case
in the gas, or allow the plaintiff to do so, to the end that the
gas may be preserved until the matters in dispute between the
parties shall be settled by the court. The bills allege that the
Carnegie Company has no immediate use for the gas, in con-
sequence of which, it desires to have the wells shut in, for the
time being, in order to prevent loss by its escape. The demurrer
of the South Penn Company having been overruled, it answered
the bill, admitting all, or substantially all, the facts but claim-
ing the right under the contract to drill the wells into the oil
bearing sands, below the "Gordon Stray" sand in which the gas
was found; denying that it was permitting the gas to escape,
and alleging that it was possible to operate the wells for both oil
and gas, saving both by proper casing and piping and the use of
certain appliances made for that purpose. Depositions were
taken and filed by both parties, and upon the hearing, the court
decided that the South Penn Company had the right to con-
tinue its operations, but, in doing so, was bound to prevent the
escape of .the gas as far as the same could be avoided by the

use of the best methods, means, devices and appliances known to operators in the oil business. Accordingly a bond in the penalty of twenty thousand dollars with condition to take the precautions aforesaid for preventing the escape of gas was required in each case, and the decrees provided that upon the execution of the bonds the injunctions should stand dissolved without further order of the court. From this decree the Carnegie Company has appealed.

Nothing is said by counsel for the appellee in support of its demurrer. To avoid repetition and endeavor to make the opinion clearer on that phase of the case, than it would be otherwise, as well as to put it in closer relation with the discussion of the propriety of the remedy sought, what is to be said about the demurrer is deferred until after the announcement of the conclusion, respecting the main question, the right involved.

Whether the contract, rather than the principles of law, without refernce to it, shall measure and determine the rights of the parties to this controversy, depends upon its interpretation. If it was their intention that the contract should affect, by way of surrender or curtailment, any right to oil or gas which the parties or either of them had, it must be given such effect, and if their intention can be ascertained from the language of the instrument without reference to any extrinsic facts or circumstances, its terms alone can be resorted to for that purpose. The South Penn Company, having taken its rights subject to this contract and thereby adopted it as its own, its name may be inserted in lieu of that of Carnahan in reading the provisions of the contract. So read, it says that if the South Penn Company, in its pursuit of oil shall "develop" a gas well or wells, the gas company shall have the right or privilege of having any such well or wells transferred to it upon payment of the actual cost of drilling the same, together with the cost of the rig and casing; and if the gas company, in its pursuit of gas, shall "develop" an oil well or wells the South Penn Company shall have the right to have such well or wells transferred to it upon payment of actual cost of drilling the same, together with the cost of the rig and casing. It further says each party shall give immediate notice to the other of the "completion" of any well, and that each party shall have thirty days from the "completion" of any well in which to exercise its option to purchase. What is meant by the terms "completion" and "develop?" Do

they mean the same thing? Counsel for appellant insist that they do, and that as soon as a gas well or an oil well is developed the well is completed within the meaning of the contract. Counsel for appellee say it is not completed until the company drilling it has sunk a well to such a depth as it may desire, notwithstanding gas or oil production may be found before that depth is reached. The order and connection in which the two terms "develop" and "completion" are used indicate that the latter is dependent for its meaning upon the interpretation of the former. The first part of the clause forms the basis of the contract and that uses the word "develop." What follows is sequential in its nature. The last subdivision of the clause, using the word "completion," provides for notice of the happening of that contingency which gives the non-drilling company its option to take the well. The second sub-division, using the same word, limits the duration of that option. Neither of these two clauses can be said to have been intended to affect what precedes them by way of enlargement or curtailment. They simply relate to the rights of the parties called into existence by the development of a gas well, when the oil company is drilling, or, of an oil well, when the gas company is drilling. Hence, when the meaning of the term "develop" is ascertained, it must control.

In seeking the intent of the parties, the court is not limited to the ascertainment of the meaning of the two words and their relation to each other, without reference to other considerations. The true rule of interpretation is that the whole instrument must be considered. From the terms of the contract, it is perceived that it relates to a large body of territory, supposed, at the date of its execution, to contain deposits of both oil and gas. To develop this territory, it would be necessary to sink a vast number of wells at great expense, many of which would prove to be worthless while others would give up fabulous wealth. The great problem confronting the parties before, and at, the time of entering into the contract, was the development of the territory. The location of the deposits must be ascertained. Some parts of the territory would prove to be, according to the experience of oil and gas operators, much more valuable than others. It was important, therfore, that test wells be drilled, and the more numerous these should be, the sooner the extent, location and character of the hidden wealth would

be known and the more rapidly it would be reduced to posses-sion. This view of the situation, and the magnitude of the task confronting them at the time of the execution of the contract, is evidenced by the provisions of the first clause, which imposed upon the gas company, as part consideration for the assignment to it made on the same day, the burden of drilling four wells on different locations, provided the first three should produce in paying quantities, respectively, either oil or gas. Carnahan was willing that the exploration made by these four wells should cease upon the discovery and production of either oil or gas, for this clause did not require the gas company to drill through the Gordon Sand, if at a lesser depth it should find oil or gas in paying quantities. In the event of finding gas in such quantity at a lesser depth it had the right to cease drilling, but was not bound to do so. Clearly the object of the requirements of said first clause was exploration with a view to determining the value of the property and indicating to Carnahan the location in which oil would be most likely to be found. It is not meant here to say that this interpretation of the first clause determines the meaning, or shows the intent of the second clause, or defines, for the purposes of the contract, the word "develop." It is referred to merely as a circumstance, apparent upon the face of the contract, indicating in part the purpose for which it was entered into. Fortunes were to be spent in the development of that territory, much of which would be lost in the drilling of dry and unproductive wells. Operating separately and without any contract, the opening of a gas well in drilling for oil would impose upon the operator a great loss, the cost of drilling the well, for he could not take the gas, it being the property of the gas company. The opening of an oil well by the gas company in seeking for its deposit would subject it to the same loss. These were circumstances which presented themselves to the parties, before they entered into the contract, and it was with a view to avoiding the risk of such great losses to themselves and waste of valuable deposits that they made this contract, providing for joint, or concurrent, operation, securing to each the preservation of what he intended to, and did, buy and retain. But for it, the development of a gas well, in drilling for oil, would give to the gas company great value as a result of the work and expense of Carnahan, if, upon his abandonment, the gas company

could take charge of the well and market its product without paying the expense of drilling it; and the completion of a well by the gas company, non-productive in gas, but rich in oil, would give wealth to Carnahan, at the expense of the gas company, if he could take the product upon abandonment of the well by the gas company. Another clause provides indemnity in case of failure of the non-drilling party to exercise its option to purchase within the stipulated period. By such failure it forfeits the product of the well to the drilling party by way of reimbursement for the expense of drilling the well. The contract says that, in such case, the well *"together with the product thereof,"* shall become the absolute property of the party drilling the same. This reflects the intent to make mutual concessions of rights and interests in aid of the general plan of development. It is an express concession or relinquishment of title under given circumstances. If further concessions are necessarily implied, or rather enforced, by compliance with an express agreement or stipulation of the contract, founded upon an adequate consideration, how can there be escape from it? Shall the court refuse to enforce the agreement bcause the effect of its performance is to deprive the party of title *pro tanto?* If the contract means what it says, in the clause providing that, "should Carnahan in his operations for oil develop a gas well or wells, the gas company shall have the right or privilege of having any such well or wells transferred to it upon payment," &c., how can that agreement be effectuated without an incidental relinquishment by Carnahan of any right he would have in the absence of the contract to go deeper with his exploration for oil? It is an utter impossibility. That right must be so extinguished or the agreement remain unenforced, and it is the very soul of the entire contract. There is no principle of law under which the court can refuse to enforce a solemn agreement, because, by its execution, a right, not expressly agreed to be surrendered, will be wrested from the party as a direct and inevitable result of compelling performance of his agreement. The result sought to be so avoided here is, moreover, so direct, immediate, certain and apparent that the parties must have foreseen, contemplated and intended it. The impossibility of knowing, in advance of the drilling, what any well would produce, made it necessary, in entering into this contract, to provide for all contingencies. By the provisions which they .

decided to put into it, in view of them, they saw that there
would result to each party great economy in the prosecution
of the work of development, the prevention of immense losses,
the better preservation of the property of each party and the
more rapid development of the territory.  In view of all this,
is it strange and unreasonable that Carnahan should have been
willing to relase or forego, the production of, any oil that
might possibly be found below the point at which a paying gas
production might be reached, or that the gas company should
be willing to give up and release its interest in any deposit of
gas lying below the point at which oil might be found in paying
quantities?  What was surrendered appeared to them then to
be, as it is now, altogether uncertain.  It had a mere possibility
of existence.  What each got in return was conditional indem-
nity against the certain loss of vast sums of money to be laid
out in the drilling of wells which he knew might not, and many
of which he knew would not, yield him any profit.  Upon
what better consideration could a contract, a surrender of
property rights, or an abondonment or a right of exploration,
be based?  In seeking the intent of the parties and the purposes
of the provisions of the contract, we must view it from the po-
sition in which the parties stood, pending the negotiations and
settlement of the terms of the contract they were about to
make so far as that position is disclosed by what the contract
contains.  As examined from that point of view, the contract
discloses a plain intent, that each party, upon its finding, in
the course of its drilling, the deposit belonging to the other
party in paying quantities, should allow such other party to
take charge of the well upon paying the cost of drilling it and
the casing and appliances, attached to it, within the time lim-
ited by the contract.  Hence, the well is completed within the
meaning of the contract upon the development of either oil or
gas in paying quantities.

Thus called into existence by the contingent exigencies, fore-
seen by the parties, while endeavoring to agree, by contract of
sale, upon a division between them of the two substances in the
land, and enter upon and carry on the work of extracting their
respective deposits, without increasing the risk of loss, always
attendant upon the prosecution of such enterprises, this covenant
forms an important element of the consideration of the two

companion contracts, simultaneously entered into. It is the inducement that overcame a seemingly otherwise insurmountable obstacle to the effectuation of the relations to the property and to one another which the parties were endeavoring to bring about. It is an offspring of what they, at the time, deemed a necessity. Even upon the theory of counsel for the appellee, something must stand in the place of it to enable the concurrent operation to be prosecuted on the premises, without damage, loss and hardship. Hence, the willingness of their client to take upon itself the burden of endeavoring to save and care for, at its own expense, a product that does not belong to it. The necessity, calling for the mutual covenant under consideration or a similar one, leaves no doubt that it was inserted upon mature deliberation and for the express purpose of determining the rights of the parties under the circumstances presented by this case. Therefore, the position that the parties did not intend what the word "develop," in its ordinary acceptation as applied to oil and gas operations, means, cannot be sustained. It would perhaps be difficult to find a word that would more clearly express the manifest intention of the parties, or indicate with a greater degree of certainty, their respective rights upon the happening of the contingencies they contemplated.

This method of interpreting the contract may, to some extent, seem to go beyond its terms, in dealing with them in the light of the subject matter, the situation of the parties, the purpose of the contract, the attending circumstances and conduct of the parties, but, when the terms of an instrument are uncertain or indefinite, it is proper to do so. 9 Cyc. 587; Devlin on Deeds, section 83; *Edwards* v. *Magers,* 13 W. Va. 822; *Caperton* v. *Caperton,* 36 W. Va. 257; *Scraggs* v. *Hill,* 37 W. Va. 706; *Shrewsbury* v. *Tufts,* 41 W. Va. 212. But is not all that has been said collected from the face of the contract? And, is not its true meaning that which results from consideration of it as an entirety?

In this discussion of the contract, everything relied upon by counsel for the appellee seems to have been noticed, except the introductory words of the second clause, saying: "The parties hereto shall have the right to operate said territory under their respective interests." Upon this is predicated the contention that the instrument does not contemplate any relinquishment of

rights.  The language is clearly introductory to the main provision upon which everything else hinges as already shown, and is qualified by what immediately follows, else what follows is practically meaningless and wholly non-effective, according to its terms.  The sentence relied upon does not say they shall *operate to the extent* of their respective interests, but under them, and then the manner and extent of operation are expressly limited and regulated.  Upon what principle can any word of this contract be allowed to remain non-effective, there being no irreconcilable contradiction?  That every word shall have effect, when it is possible, is an inviolable canon of the law of interpretation and construction.  An extrinsic circumstance relied upon is the alleged possibility of operating the wells for gas and oil at the same time without damage or loss to either party.  This is denied and the evidence respecting it is very conflicting, but if it were conclusively shown, the contract on its face plainly discloses an intent to forego the privilege of that experiment.

This conclusion renders it unnecessary to discuss the case in the light of the principles which would determine the rights of the parties in the absence of a contract, unless it be assumed that their knowledge of these principles in some way bears upon the question of intent to be ascertained from the terms of the contract.  Enough has already been said to show that it was very much to their interest to avoid the effect of these principles.  By their relation, unrestrained by contract, the very contingency of loss, averted by the provisions of the contract, would have resulted to both parties from an effort to develop.  It was not the case of a man operating under a lease which gave him both oil and gas, for, in the event of the production of either, his venture is profitable.  Loss ensues only when he fails to find either deposit.  But where one man owns the oil and the other the gas in the same land, the risk of each is much greater, as has already been shown, and this necessitates a contract to limit it.

Coming now to the demurrer, it is to be observed that if there is any question of title, it is one purely of law, turning upon the construction of the contract, and involving nothing proper for determination by a jury.  The principles announced in *Freer* v. *Davis*, 52 W. Va. 1, do not preclude equity jurisdiction of the whole case, when its extraordinary preventive jurisdiction is called for by acts working irreparable injury, if the circum-

stances of the case do not give the right of trial by jury on the question of title. Mr. Story says that if the relief is dependent upon a question of fact, fit to be tried by a jury, the equitable jurisdiction for relief should be altogether declined, or the bill should be retained only pending a trial at law. Story's Eq. Jur. section 72. In *Freer* v. *Davis,* 52 W. Va. 1, 8, the opinion says: "And the decisive test seems to be the necessity of a trial by jury of disputed questions of fact necessary to the ascertainment of the legal right involved." The limitation, by the decision in *Freer* v. *Davis,* of the doctrine announced in *Bettman* v. *Harness,* 42 W. Va. 433, does not deny equity jurisdiction in that case. See 52 W. Va. p. 8. We have here no hostility of title, nor any question of fact upon which relief is dependent, but only one of law, the construction of the contract. The bill is in the nature of one for specific performance. Oil and gas *in situ* are real estate. The wells are avenues or conduits through which the oil and gas are brought to the surface and severed. They constitute the means of reaching appellant's property and are analogous to ways, appurtenant to the property and indispensable to its enjoyment. Carnahan bound himself, as hereinbefore shown, to sell them, under certain conditions, to the gas company, as part of the consideration, moving the entire agreement, in case he should drill any. Upon tendering payment, the gas company's option to purchase became an executory contract. An action at law for damages for the breach is as inadequate here as in the case of a contract of sale of real estate. The gas company is entitled to take out through the wells in controversy such of its gas as will flow from them and there is no certainty that all of it can be obtained in any other way. A new well a few feet distant from one of them might be wholly unproductive. To require property to be involuntarily given up in exchange for money is contrary to the policy of the law. Hence, it provides detinue for the recovery of specific personal property, unlawful entry and detainer for the possession of real estate and ejectment for title. When the property is of such nature that none of the legal remedies will protect it, there is no adequate remedy at law, and ground for equity jurisdiction is shown. Withholding the wells in question here, prevents the appellant from obtaining its property, for in violation of the contract, the means of procuring it are withheld. The covenant in question lies at the very foundation of the two

contracts. To refuse enforcement of it would impair the value of the lease as a whole. ˙No remedy in a court of law is broad enough to cover the extent of the injury, nor, to state a more technical ground, to give the appellant its specific property. Neither unlawful entry and detainer nor ejectment lies, for the appellant's right is under an executory contract, which will give him the right to possesion by performance only. Appellant has not been put into possession and then ousted. Its right, is as yet an equity, not a perfected title in the eye of the law. But two remedies are open to the gas company, an action at law for breach of the covenant, and a suit in equity for specific performance. The latter only can give the means of access to appellant's property and is therefore, the only adequate remedy, viewed from the standpoint of the nature of the right involved, and the only one that can directly maintain the value of the leasehold interest under the contracts. Equity has jurisdiction to enforce specific performance of a lease. *West Va. &c. Co.* v. *Vinal,* 14 W. Va. 637, (pt. 5 Syl.) ; *Oil Co.* v. *Oil Co.,* 47 W. Va. 84, 102; *Bettman* v. *Harness,* 42 W. Va. 433 ; *McGrager* v. *Rood,* 47 Cal. 138 ; *Smith* v. *Church,* 107 N. Y. 610 ; *Ryder* v. *Robinson,* 109 Mass. 67 ; *Robinson* v. *Perry,* 21 Ga. 183 ; 68 Am. Dec. 455 ; 22 Am. & Eng. Ency. Law, (old Ed.) 972. "Equity assumes jurisdiction, however, (for specific performance of contracts), over all manner of rights and interests connected with real estate, for example, in addition to contracts which relate to fee-simple interests in land, leasehold estates, life estates, easements, expectancies, riparian rights, and, indeed, any interest or estate, legal or equitable, which arises out of real property." 26 Am. & Eng. Ency. Law, (2d Ed.) 104.

Thus it appears that the case arises under the ordinary equity jurisdiction, and not upon facts calling only for the exercise of the extraordinary jurisdiction by injunction. In such case, the injunction becomes a mere process in the exercise of ordinary equity jurisdiction. It is a means or agency used to preserve the *status quo* pending the determination of the rights of the parties in equity, and process for executing the final decree, and, in the latter instance, may be either prohibitory or mandatory, according to the exigencies of the case. 20 Ency. Pl. & Pr. 518; *Wharton* v. *Stoutenburgh,* 39 N. J. Eq. 299.

For the foregoing reasons the two decrees complained of will be

reversed, the injunctions perpetuated and the causes remanded for such further proceedings as may be necessary to give the appellant full relief upon its said bills, according to the principles herein stated and the rules and principles governing courts of equity.

*Reversed.*