# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**January 2022 Term**

_____

**No. 20-0965**

_____

**FILED**

**April 8, 2022**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**ANTERO RESOURCES CORPORATION,**
Defendant below, Petitioner,

v.

**DIRECTIONAL ONE SERVICES INC. USA,**
Plaintiff below, Respondent.

_____

**Appeal from the Circuit Court of Tyler County,**
**Business Court Division**
**The Honorable H. Charles Carl, III, Judge**
**Civil Action No. 18-C-14**

**AFFIRMED**

_____

**Submitted: February 16, 2022**
**Filed: April 8, 2022**

Ancil G. Ramey, Esq.
Steptoe & Johnson PLLC
Huntington, West Virginia
W. Henry Lawrence, Esq.
John D. Pizzo, Esq.
Steptoe & Johnson PLLC
Bridgeport, West Virginia
Counsel for Petitioner Antero
Resources Corporation

Lonnie C. Simmons, Esq.
DiPiero Simmons McGinley &
Bastress, PLLC
Charleston, West Virginia
Christopher Kamper, Esq.
Carver Schwarz McNab Kamper &
Forbes, LLC
Denver, Colorado
Counsel for Respondent Directional
One Services Inc. USA

**CHIEF JUSTICE HUTCHISON delivered the Opinion of the Court.**

**JUSTICE WALKER and JUSTICE ARMSTEAD dissent and reserve the right to file a separate opinion.**

**JUSTICE MOATS, sitting by temporary designation.**

**SYLLABUS BY THE COURT**

1.      "Separate written instruments will be construed together and considered to constitute one transaction where the parties and the subject matter are the same, and where there is clearly a relationship between the documents."  Syllabus point 3, *McCartney v. Coberly*, 250 S.E.2d 777 (W. Va. 1978), *overruled on other grounds by Overfield v. Collins*, 199 W. Va. 27, 483 S.E.2d 27 (1996).

2.      "A contract must be considered as a whole, effect being given, if possible, to all parts of the instrument."  Syllabus, *Clayton v. Nicely*, 116 W. Va. 460, 182 S.E. 569 (1935).

3.      "The primary consideration in the construction of a contract is the intention of the parties.  This intention must be gathered from an examination of the whole instrument, which should be so construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious."  Syllabus, *Henderson Dev. Co. v. United Fuel*, 121 W.Va. 284, 3 S.E.2d 217 (1939).

4.      "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent."  Syllabus point 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

5.      "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their

i

written contract or to make a new or different contract for them." Syllabus point 3, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962).

**HUTCHISON, Chief Justice**:

In this appeal from the Business Court Division of the Circuit Court of Tyler County, we consider the circuit court's ruling that because two separate documents involved the same parties, the same subject, and the documents were clearly related, then they should be construed together as the terms of one contract between the parties. Moreover, we examine the circuit court's efforts to harmonize the two documents and give every word, phrase and clause meaning, particularly in light of how the parties interpreted and applied the two documents over a three-year period. As we discuss below, we find no error in the circuit court's rulings.

## I. Factual and Procedural Background

The underlying facts in this case are undisputed. Further, the parties agree that they have a binding contract; however, the terms of that contract are in dispute. Essentially, the parties dispute who bears the cost for natural gas drilling equipment that is "lost in hole" or "LIH," that is, when tools and equipment used for drilling get stuck down a drill hole and must be abandoned.

Defendant Antero Resources Corporation ("Antero") produces natural gas and related products in the shale formations of the Appalachian Basin. Natural gas fields are brought into production by either Antero, or an agent supervised by Antero, drilling a well.

1

Plaintiff Directional One Services Inc., USA ("Directional One") is a "directional" drilling equipment supplier. Directional One supplies Antero or the Antero agents who drill the natural gas wells with the "bottom hole assembly," the assemblage of tools and equipment that steers the lower portion of a drill string deep into the earth and thousands of feet horizontally through gas-rich shale deposits. Antero and/or its agents attach Directional One's tools and equipment to other drilling equipment controlled by Antero or its agents. Directional One also supplies people who repair the tools and equipment, monitor the drilling, and advise the driller on how to steer the bottom hole assembly. Directional One claims its equipment uses a process of drilling shale "on air" that is faster and more efficient than conventional drilling, thereby saving Antero significant sums of money, but the process subjects the equipment on the bottom hole assembly to a more violent and destructive environment.

At Antero's request, on August 25, 2014, Directional One submitted a "directional drilling proposal" to Antero's director of drilling operations. This written proposal, what the parties refer to as a "rate sheet," says on the first page that "all work quoted within will be performed under our . . . Terms and Conditions." The document laid out Directional One's daily fees for supplying various types of directional tools and equipment. Importantly, the rate sheet also contained a separate list of "Replacement / Lost in Hole Prices," and a statement that if any Directional One equipment was "lost, damaged, [or] destroyed" below ground in the drilling borehole then Antero would reimburse Directional One those amounts. Moreover, the rate sheet contained a section of "General

2

Terms and Conditions," including a provision permitting Antero (or its agents) to either "fish" out equipment lost in the drilling hole or to pay the replacement cost:

> In the event any of Directional ONE['s] . . . down-hole equipment is damaged or lost in the well, [Antero] shall either recover same without cost to Directional ONE . . . or pay for any damage to or loss of such equipment.

Finally, the rate sheet contained a "Lost In Hole Liability Reduction" provision whereby Antero could elect to pay a higher daily rate for equipment for each well and, if Directional One's equipment was later lost in the drilling hole, then Antero would pay "50% only of published 'Lost in Hole' charges."[1]

Antero's director of drilling operations later testified that he reviewed Directional One's lost-in-hole rates and found them reasonable and typical for the industry

---

[1] The parties refer to this reduction-in-liability provision as "lost in hole" or "LIH" insurance. In part, the provision reads:

> (a) Directional ONE . . . offers the option of Lost In Hole Liability Reduction on 3<u>rd party</u> Drilling Motors and Measurement While Drilling tools under the following conditions:
>
> (b) Coverage is for 50% only of published "Lost in Hole" charges.
>
> (c) The Lost In Hole Liability Reduction option must be exercised and documented in writing by the customer or his duly authorized representative prior to the first time the equipment is lowered below the rotary table on any particular well and will continue for the duration of the well unless terminated . . .
>
> (g) A minimum of two fishing attempts must be made to retrieve equipment before a claim can be made.

and for Antero's other drilling contractors.  On September 19, 2014, Antero's director of drilling operations signed and accepted "the terms and conditions" in Directional One's proposed rate sheet.

The parties executed a second document on September 19, 2014, a contract drafted by Antero and titled "Master Services Agreement" or "MSA."  The 2014 MSA, which the parties made effective "as of August 29, 2014," is an 18-page document outlining the relationship between the parties.  The parties subsequently executed a new MSA a year later, effective September 30, 2015, that the parties agree is identical in all relevant aspects to the 2014 MSA.

The two MSAs state that "the Parties are entering into this Agreement because [Antero] may, from time to time, request Work to be performed by [Directional One]."  The MSA does not specifically define what "work" Directional One would be doing for Antero, but it does provide this general definition of the term:

> "**Work**" shall mean any and all services, labor, experience, expertise, vehicles, *equipment*, supplies, *tools*, manufactured articles, materials, facilities, and/or goods (in whole and/or in part) to be provided by [Directional One] to [Antero] pursuant to this Agreement and/or any Order.

(Italics added).  The MSA does, however, provide that Antero would pay for any "work" according to Directional One's "published schedule of rates and/or prices":

> [Antero] will pay [Directional One] for Work that is satisfactorily rendered and in accordance with this Agreement . . . in accordance with [Directional One]'s published schedule of rates and/or prices, as such rates and/or prices are in effect on the date of the Order[.]

Neither the 2014 nor the 2015 MSA contains any schedule of rates or prices by which Directional One would be paid for its services, nor do the MSAs outline the services, expertise, tools, or equipment that Directional One would provide.

After producing its initial proposed rate sheet in 2014, Directional One periodically issued new rate sheets that reflected fluctuations or discounts in prices for equipment and services it supplied to Antero. By their terms, rate sheets could be updated on 30 days' notice. Antero never signed any of these subsequent rate sheets, but it also never objected to any rate sheet or, more importantly, objected to any of the terms and conditions in any rate sheet.

Over the following three years, Antero regularly paid Directional One's invoices formed on the basis of the then-current rate sheet. Antero paid for repairs to equipment and tools that were damaged in the drilling process. More importantly, the record reflects that on at least four occasions Antero paid invoices for Directional One equipment and tools that were lost in hole.[2] Three of these invoices involved equipment lost under the 2014 MSA and before the execution of the 2015 MSA, but despite Directional One seeking reimbursement for lost-in-hole equipment and Antero's full payment of those invoices, neither party requested any consequential change to the MSA.

---

[2] The record contains invoices from Directional One to Antero for equipment lost in holes on three occasions under the 2014 MSA (December 24, 2014; July 12, 2015; and July 28, 2015) and on one occasion under the 2015 MSA (October 13, 2016).

5

Between 2014 and 2017, the parties worked together and drilled more than 250 wells. Antero routinely elected and paid extra fees under the "Lost In Hole Liability Reduction" provision in Directional One's rate sheets, a payment that reduced its later expense for equipment lost in a drilling hole. However, Antero's director of drilling operations testified that, in late 2017, Antero elected to stop paying the liability-reduction fee as "a pure economic decision" based on "the performance demonstrated" after "nearly three years of development of a new drilling technique." While one Antero employee thought the move reflected Antero's "appetite of risk," another testified that "[j]ust because . . . you haven't wrecked your car, doesn't mean you drop your car insurance."

On December 20, 2017, Antero began drilling the Jameson Unit 1H well in Tyler County, West Virginia, and used equipment and expertise supplied by Directional One. Antero did not elect or pay for the protection offered by the "Lost In Hole Liability Reduction" provision of the rate sheet. On December 29th, an Antero agent operating the drill string allegedly failed to follow a recommendation from a Directional One employee and the drill string became stuck in the well. Antero attempted to fish the equipment out of the well but was unsuccessful. Antero then plugged the wellbore with cement, preventing Directional One from retrieving its equipment, on January 3, 2018.

Directional One submitted an invoice to Antero for $762,425.30 for the Jameson Unit 1H equipment according to the lost-in-hole fees on its rate sheet. Antero refused to pay the invoice and demanded further information. When Directional One resisted producing information and insisted Antero pay, Antero threatened to audit all of

Directional One's past invoices. When Directional One threatened to walk off the drilling job, Antero apparently threatened legal action.

Then, on February 23, 2018, Antero was drilling a different well, the Jack Unit 2H, using Directional One's equipment. Again, Antero neither elected nor paid for the liability-reduction provision. Again, Directional One's equipment became lodged in the bore hole. Antero could not fish the lost-in-hole equipment out and the wellbore was cemented over. Directional One sent Antero an invoice for $719,085.00 for the Jack Unit 2H equipment lost in the hole, but Antero again refused to pay.[3]

Effective March 20, 2018, Directional One exercised its rights to terminate its contractual relationship with Antero.

---

[3] After Antero refused to pay the two invoices, an internal email between Antero employees, dated April 4, 2018, suggests that Antero understood the problems created by its decision to no longer opt for and pay the fee for the lost-in-hole, reduction-in-liability provision from Directional One (what the employees called "LIH insurance"):

> Antero chooses whether it wants LIH insurance or not on each well (not the vendor). I would suspect that after we lost assemblies [in the past], the operations team decided that we should buy that insurance which is within their decision-making authority. The LIH insurance typically reduces the amount owed for a LIH assembly by 50%. . . . Antero made that decision. Recently, we decided in the ops team to stop using LIH insurance because statistically we hadn't lost many tools. Subsequent to no longer taking that insurance we then lost 2 sets of tools from Directional One.

7

On April 6, 2018, Directional One sued Antero in the Circuit Court of Tyler County. Among the theories asserted in its complaint and a later amended complaint, Directional One alleged that Antero had breached the contract between the parties by refusing to pay the invoices for lost-in-hole equipment. Alternatively, Directional One alleged Antero was bound by the doctrine of estoppel because Antero's past conduct led Directional One to believe it would continue to be paid according to its rate sheet for lost-in-hole equipment.

Antero filed an answer that included a four-count counterclaim against Directional One. In counts one, two, and three, Antero alleged that Directional One had breached the parties' contract by, in past years, billing Antero for equipment damaged or lost in hole and billing Antero under the "Lost In Hole Liability Reduction" provision of the rate sheet. Antero asserted that Directional One was solely responsible for the costs of replacing or repairing all of its lost or damaged equipment. In count four of the counterclaim, Antero claimed that Directional One overbilled Antero for time employees were not actually working on an Antero project. Antero demanded that Directional One be compelled to reimburse in excess of $3.6 million in charges to Antero.

On February 19, 2019, this Court entered an administrative order referring the parties' dispute to the West Virginia Business Court.

After discovery, Directional One moved for summary judgment on its contract claims against Antero, arguing that the MSA and rate sheets must be read together

as one contract to require Antero to pay for the lost-in-hole equipment. Directional One also asked for summary judgment to dismiss Antero's counterclaims. Antero countered by filing its own motion for summary judgment to dismiss all of Directional One's claims. Antero also sought summary judgment in its favor on its four counterclaims, arguing that Antero never had a contractual obligation to pay many of Directional One's past invoices. In two orders dated August 19, 2019, the circuit court partially granted Directional One's motion for summary judgment and denied Antero's motion for summary judgment.

To begin, the circuit court granted summary judgment and found, as a matter of law, that Antero had breached its contract with Directional One. The circuit court noted that "[i]t is a well-recognized principle of law that, even though writings may be separate, they will be construed together and considered to constitute one transaction when the parties are the same, the subject matter is the same and the relationship between the documents is clearly apparent." *Ashland Oil, Inc. v. Donahue*, 159 W. Va. 463, 469, 223 S.E.2d 433, 437 (1976). Even if in conflict, separate contract provisions "will be construed together if possible. . . . The one will not be given control over the other if they can possibly be reconciled, it being presumed that the contract contains no provisions or clauses not intended by the parties." *Gabbert v. William Seymour Edwards Oil Co*., 76 W. Va. 718, ___, 86 S.E. 671, 672 (1915).

The circuit court found that the unambiguous language of the MSA required Antero to pay Directional One for "work," a term the MSA defined to include tools and equipment provided to Antero, and at a price in accordance with Directional One's

9

"published" rate sheets. The MSA drafted by Antero specifically referred to Directional One's rate sheets in at least three different places.[4] Standing alone, the MSA would be ambiguous and meaningless if read without Directional One's rate sheets. Moreover, the circuit court determined that the MSA is "incomplete without the information contained in the Rate Sheet[s]" because "[t]he MSA contains no pricing whatsoever[.]" Additionally, between 2014 and 2017, Antero had interpreted the MSA and the rate sheets as being intertwined and as requiring Antero to pay for damaged and lost-in-hole equipment. The court concluded that the MSA and the rate sheets were "interrelated and should be construed together to constitute one transaction." Construing the MSA and rate sheets together, the circuit court concluded that the MSA required Antero to pay for tools and equipment, and that Directional One's rate sheets established the prices for tools and equipment. The rate sheets included per-day prices for equipment that Antero merely used, and replacement prices for equipment that was lost in hole.

The circuit court also found no factual dispute that Directional One provided tools, equipment, and skilled labor to Antero, and that on several occasions those tools and equipment were damaged or lost in hole. Between 2014 and late 2017, both parties

---

[4] Paragraph 10.1 of the MSA provided that Antero would pay Directional One "for Work that is satisfactorily rendered . . . in accordance with [Directional One]'s published schedule of rates and/or prices[.]" Paragraph 10.2 states that "[t]he rates to be paid to [Directional One] by [Antero] for the Work shall be in lieu of any other charges for materials or supplies furnished by [Directional One] . . . unless otherwise specified in the scheduled rates." Finally, paragraph 19 of the MSA specifies that "[i]f there are any conflicts between the provisions of this Agreement and any . . . published rate schedule . . . the provisions of this Agreement shall control[.]"

10

complied with the terms of the rate sheets: Directional One sent numerous invoices, including for damaged and lost-in-hole equipment, and Antero paid those invoices. Further, the record established that Antero had overall supervisory authority of the drilling operations, including sole authority to decide what to do with a lost-in-hole tool: either "fish" the tool out of the hole, or plug the wellbore and abandon the stuck tool. The MSA contained no language as to "fishing" or abandoning tools and equipment lost in hole. The only language for the "fishing" procedure was contained in Directional One's rate sheets, and that language required Antero to "either recover [the equipment] without cost to Directional ONE or pay for any damage to or loss of such equipment." And finally, the record established that, in December 2017 and February 2018, Antero (or its agents) lost equipment provided by Directional One down in the borehole, and yet Antero refused to pay for the "work" as defined in Directional One's published rate sheets.

There was no genuine issue of material fact, and so the circuit court ruled that Antero was contractually responsible to Directional One for any lost-in-hole tools and equipment. The circuit court found as a matter of law that Antero breached the parties' agreement and granted partial summary judgment in favor of Directional One.[5]

---

[5] The circuit court found that other legal theories alleged by Directional One in its complaint, including estoppel, were asserted as alternative theories to Antero's liability for breach of contract. Accordingly, the circuit court declared those alternative theories moot and dismissed them as well.

11

The circuit court's orders also addressed Antero's four counterclaims. Directional One asked the circuit court to dismiss the counterclaims; Antero moved for judgment in its favor on all four claims. The first three of Antero's counterclaims asserted that Directional One should not have invoiced Antero for lost-in-hole tools; that Directional One should not have sent invoices for tool repairs; and that Directional One should not have sent invoices to Antero for the "Lost In Hole Liability Reduction" fee, despite Antero requesting the protection provided by this provision of the rate sheets.

The circuit court noted Antero's contention that the MSA required Directional One to generally indemnify and hold harmless Antero for "the damage to or loss of property of" Directional One, regardless of cause. The MSA also required Directional One to maintain a diverse portfolio of insurance, including insuring "equipment . . . used in the Work."[6] However, the circuit court sought to harmonize terms of the MSA and terms of the rate sheets, and to give meaning to the parties' intentions. The circuit court found that the general indemnification and insurance clauses of the MSA, and the specific terms of the rate sheets providing that Antero was responsible for damaged or lost-in-hole equipment, could reasonably be construed together:

> The two provisions work together to articulate a single rule that [Directional One] was responsible for its tools and equipment up to the point where they entered the wellbore (the time period

---

[6] The record suggests, however, that third-party insurance for lost-in-hole equipment is of zero or limited availability. However, Directional One would secure such coverage when it was reasonably available from a tool supplier. There is nothing in the record to suggest insurance was available to cover the lost-in-hole equipment at issue in this case.

[Directional One] had control over the tools and equipment), at which point [Antero] assumed responsibility for them (the time period [Antero] controlled the tools and equipment).

Between 2014 and late 2017, the parties had construed the general clauses of the MSA and the specific clauses of the rate sheets together. In that time period, Directional One submitted numerous invoices for the inspection, repair, or replacement of damaged or lost equipment, and without exception each was reviewed, approved, and paid by Antero. It was only after Directional One's equipment was lost in hole in December 2017 that Antero insisted the MSA placed sole liability on Directional One.

Furthermore, between 2014 and late-2017, the circuit court found that Antero and Directional One were "challenging existing conventions and drilling methods" by using air drilling. During that period, Antero exercised the option to purchase the "Lost In Hole Liability Reduction" insurance from Directional One. Antero repeatedly completed a written form for each well requesting the reduction in liability and paid for this option to reduce its potential liability for lost-in-hole equipment, despite the MSA requiring, as a general matter, that Directional One maintain insurance for its equipment. When equipment was lost in a well, Antero paid a reduced price to replace the equipment as a

13

result.[7]  At some point late in 2017, Antero chose to stop requesting the optional liability reduction service.[8]

Building upon its prior conclusion that the plain and unambiguous language of the MSA and rate sheets, when read together, required Antero to pay for lost-in-hole equipment, the circuit court also found no conflict between the indemnity and insurance provisions of the MSA and the rate sheets.  Construing the documents together, the circuit court found no genuine issue of material fact that Antero agreed to pay for lost-in-hole equipment and tools, to pay for tool repairs, and to pay for the lost-in-hole liability reduction service offered by Directional One.  Accordingly, the circuit court granted summary judgment in favor of Directional One and against Antero, and dismissed counts one, two, and three of Antero's counterclaim.

Count four of Antero's counterclaim alleged that Directional One had double billed for charges related to standby charges and daily rates for employees who were to be available at an Antero well site.  Antero averred that it had identified 256 instances of such

---

[7] For example, when tools were lost in hole while drilling a well on October 13, 2016, the record reflects that Antero's cost for the tool replacement was reduced from $694,185 to $406,431.50 as a result of Antero's decision to exercise and pay for the "Lost In Hole Liability Reduction" service in Directional One's rate sheets.

[8] The record reflects that, when Directional One sent Antero an invoice for the equipment lost in hole at the Jack Unit 2H well in February 2018, an internal Antero communication related that, "[a]s far as the LIH charges, I know that we opted not to utilize insurance on this well."

double billing. On this sole count the circuit court found genuine issues of material fact existed, and therefore denied summary judgment to both parties.

Following its rulings on the parties' summary judgment motions, the circuit court conducted a trial in August of 2020 on count four of Antero's counterclaim. The parties presented evidence, including the MSA and the rate sheets.[9] The jury was instructed, without objection by Antero, that "[p]arties can form contracts that consist of more than one document" and those separate writings "will be construed together to constitute one transaction[.]" After deliberations, the jury returned a verdict in favor of Directional One. The jury found, under the parties' contract, that Antero failed to prove Directional One had sent invoices for improper charges. Antero does not challenge any of the trial proceedings, nor does it contest the jury's verdict in this appeal.

In a final order dated November 4, 2020, the circuit court entered judgment in favor of Directional One. The circuit court awarded Directional One $1,481,510.30, plus pre- and post-judgment interest.[10]

---

[9] Directional One points out that it submitted into evidence an email from an Antero vice president suggesting that the dollar amounts at issue in this case were not worth the trouble of litigation "unless we want to make an example out of someone." Antero does not appeal the circuit court's decision to admit this email into evidence.

[10] The circuit court also noted that, at the outset of litigation, Directional One had filed a mechanic's lien with the County Clerk of Tyler County against Antero's assets. *See* W. Va. Code §§ 38-2-2, -3, -4, -5, and -6. The circuit court found the lien valid and prioritized pursuant to West Virginia Code §§ 38-2-17 and -18.

15

Antero now appeals the circuit court's November 4, 2020, final judgment order. Specifically, Antero challenges the circuit court's August 19, 2019, summary judgment rulings that underlie that order.

## II. Standard of Review

We review the circuit court's summary judgment rulings de novo on appeal. Syl. pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994). *See also*, *Zimmerer v. Romano*, 223 W. Va. 769, 777, 679 S.E.2d 601, 609 (2009) (per curiam) ("[W]e apply a *de novo* standard of review to the circuit court's interpretation of the contract.").

## III. Discussion

The parties agree that they had a contract, and they agree that no facts are in dispute. However, they disagree as to where the MSA and the rate sheets placed responsibility for the lost-in-hole equipment. Antero offers a broad array of overlapping assertions why the circuit court erred in concluding Antero breached the parties' agreement. However, as we discuss below, we find no merit to Antero's assertions.

Antero's primary contention is that the circuit court improperly ruled the rate sheets could modify the MSA. The MSA provided that it could not be modified by any "project managers, field personnel, or consultants" and could only be modified "in writing, signed by the Parties, and specifically referencing this Agreement." Antero asserts this

16

language must be interpreted to mean that only a corporate executive could sign.[11]  Further, Antero asserts that only the first rate sheet (the August 2014 "directional drilling proposal") was signed by an Antero employee, and Antero never signed any subsequent rate sheet.  Further, none of the rate sheets referenced the MSA.  In sum, Antero claims that because the Directional One rate sheets attempted to modify the MSA but did not comply with the process established in the MSA, the circuit court erred.

Additionally, Antero asserts that the MSA and the rate sheets were not contemporaneous writings (despite initially being signed the same day in 2014) and, accordingly, cannot be construed together.  Antero asserts that because the documents were drafted separately,[12] and because the rate sheets do not specifically reference the MSA, the separate writings cannot be construed together or considered to be one contract.  Overall,

---

[11] Antero goes further and posits that this language in the MSA means that only Alvin Schopp, Antero's Chief Administrative Officer and Regional Senior Vice President, had the authority to modify the MSA.  This position is based on a separate clause of the MSA which requires that "[a]ny notices or other communications" be mailed to Antero's corporate headquarters with a notation on the envelope saying "Attn: Al Schopp."  We find this argument strains credulity, particularly when the record shows at least seven Antero executives reviewed and approved Directional One's rate sheets and the invoices that were based on them.

[12] Antero also claims the two writings were drafted "without input from the other party or contemplation of the other document."  The record does not, however, support this claim.  The record shows that Directional One repeatedly modified its rate sheets to reflect changes in market conditions and, more importantly, complaints from Antero and requests by Antero for additional discounts.  Despite the parties' ongoing relationship, and the losses of equipment in hole on at least four occasions, Antero never sought to have Directional One modify the rate sheets to remove the provisions regarding lost-in-hole tools and equipment.

17

Antero claims that the rate sheets were merely contemplated by the MSA as "the *prices* for Directional One's daily operational rate and its standby day rates."

Directional One responds, correctly, that the circuit court never ruled that the MSA was "modified by" the rate sheets, and that Antero is assigning error to a ruling the circuit court never made. Moreover, Directional One points out that the MSA does not say that it stands alone. Rather, the MSA provides that it "shall control" only "[i]f there are any conflicts" with other writings, such as the rate sheets, and then only "to the extent of the conflict." Directional One contends that if the MSA stands alone and the rate sheets are not a part of the parties' agreement, then this language of the MSA would be wholly unnecessary and meaningless. Additionally, if Antero's claim is correct that the rate sheets are effective only to the extent that they contain raw pricing numbers, then the conflict provision would again be meaningless because raw numbers could never conflict with the MSA, which contains no pricing information at all. Hence, Directional One asserts that the circuit court's assessment that the parties intended for the MSA and the rate sheets to be read together was correct. We agree.

The circuit court determined that the MSA and the rate sheets were interrelated documents that must be read and construed together as part of the same transaction. Our law is clear that "[s]eparate written instruments will be construed together and considered to constitute one transaction where the parties and the subject matter are the same, and where there is clearly a relationship between the documents." Syl. pt. 3, *McCartney v. Coberly*, 250 S.E.2d 777 (W. Va. 1978), *overruled on other grounds by* Syl.

18

pt. 2, *Overfield v. Collins*, 199 W.Va. 27, 483 S.E.2d 27 (1996). *Accord*, Syl. pt. 3, *TD Auto Fin. LLC v. Reynolds*, 243 W. Va. 230, 842 S.E.2d 783 (2020). Stated differently, "[i]t is a well-recognized principle of law that, even though writings may be separate, they will be construed together and considered to constitute one transaction when the parties are the same, the subject matter is the same and the relationship between the documents is clearly apparent." *Ashland Oil, Inc. v. Donahue*, 159 W. Va. at 469, 223 S.E.2d at 437. *See also*, Syllabus, *Minear Coal Co. v. Miller-Todd Coal Co.*, 126 W. Va. 151, 27 S.E.2d 428 (1943) ("Two instruments that are executed by the same parties in the course of the same transaction will be read together and considered as a single contract that may be supported by a single consideration."). This Court recently discussed how separate writings may be construed as one contract, a process sometimes called the "single transaction rule," and noted there is no requirement that the writings be "contemporaneously executed." *Miller v. WesBanco Bank, Inc.*, 245 W. Va. 363, 859 S.E.2d 306, 326 (2021). "[T]he single transaction rule applies even where documents were executed at different times and/or by different parties . . . and do not in terms refer to each other." *Id.* at 327–28 (cleaned up).

Additionally, the primary goal of a court construing a contract is to ascertain and give effect to the parties' intent. "A contract must be considered as a whole, effect being given, if possible, to all parts of the instrument." Syl., *Clayton v. Nicely*, 116 W. Va. 460, 182 S.E. 569 (1935). The parties' intent is derived from every word, phrase, and clause used by the parties in their writing(s):

The primary consideration in the construction of a contract is the intention of the parties. This intention must be gathered from an examination of the whole instrument, which should be so construed, if possible, as to give meaning to every word, phrase and clause and also render all its provisions consistent and harmonious.

Syl., *Henderson Dev. Co. v. United Fuel*, 121 W.Va. 284, 3 S.E.2d 217 (1939). "No word or clause in a contract is to be treated as a redundancy, if any meaning reasonable and consistent with other parts can be given to it." Syl. pt. 3, *Carnegie Nat. Gas Co. v. S. Penn Oil Co.*, 56 W. Va. 402, 49 S.E. 548 (1904). "A valid written instrument which expresses the intent of the parties in plain and unambiguous language is not subject to judicial construction or interpretation but will be applied and enforced according to such intent." Syl. pt. 1, *Cotiga Dev. Co. v. United Fuel Gas Co.*, 147 W. Va. 484, 128 S.E.2d 626 (1962). "It is not the right or province of a court to alter, pervert or destroy the clear meaning and intent of the parties as expressed in unambiguous language in their written contract or to make a new or different contract for them." *Id.*, Syl. pt. 3.

The record supports the circuit court's conclusion that the parties entered into an agreement for Antero to pay Directional One compensation for its labor, expertise, tools, and equipment. Two writings formed that agreement: the MSAs and the rate sheets. The writings were not in conflict but, rather, the rate sheets qualified and gave meaning to the MSA. The MSA required Antero to pay compensation based upon Directional One's rate sheets, and those rate sheets made clear that if Antero (or its agents) damaged or lost Directional One's tools and equipment in the borehole, then Antero would pay Directional One for their repair or replacement.

20

For over three years, Antero acted as though the MSAs and the rate sheets were interrelated and should be construed together. Antero routinely paid Directional One's invoices based upon those rate sheets, including for damaged or lost-in-hole equipment and tools. The record shows Antero understood it bore the liability for lost-in-hole equipment because, during those three years, Antero elected and purchased the lost-in-hole, liability-reduction service from Directional One that reduced its liability for lost equipment and tools by half.[13] Only after the lost-in-hole incident in December 2017 did Antero assert that the MSAs were the sole agreement between the parties and that the rate sheets had no meaning, other than to provide a daily price for services. As the leading treatise on contracts makes clear, "[l]itigants frequently assert an interpretation of a contract different from that suggested by their conduct or words during the course of their performance of the contract" but that "the courts will still give great weight to the parties' contemporaneous and subsequent practical interpretation" of a contract. 11 Richard A. Lord, *Williston on Contracts* § 32:14 (4th ed. 2021). We reject Antero's inconsistent position, including its claim the circuit court "modified" the MSAs. The record supports the circuit court's determination that the MSAs and rate sheets involved the same parties,

---

[13] Antero argues that its purchase of this lost-in-hole, liability reduction service was contrary to the terms of the MSA, and in its counterclaim before the circuit court demanded a refund of all fees it had paid for this service. However, the record establishes that Antero specifically requested this "lost-in-hole insurance" for each well by completing a form, and that each invoice for the service was thereafter reviewed by numerous Antero executives. In an internal e-mail, Antero executives admitted that the employees who requested the "lost-in-hole insurance" were acting "within their decision-making authority."

the same subject matter, and that the two documents were clearly related. Hence, the circuit court properly found the separate documents should be read together as one agreement.

Still, despite there being no use of the phrase "lost in hole" or its equivalents in the MSA, Antero vigorously contends that other provisions in the MSA mandated Directional One bear the risk and costs for its lost-in-hole equipment. Antero points to one paragraph of the MSA which provided that, by taking on a job, Directional One "has, and warrants that it has, fully investigated and incorporated into the *compensation* . . . the complications, hazards, and risks incident to the Site and/or performing the Work[.]" (Emphasis added.) The MSA uses the term "compensation," but Antero claims the circuit court should have limited this term to "daily rates." Antero analogizes that allowing Directional One to charge separately for lost-in-hole equipment "makes no more sense [than] allowing an electrician, plumber, or carpenter to charge separately for their equipment lost or damaged in providing professional services." Additionally, Antero asserts that because Directional One should have borne the risk of equipment being lost in hole, it should not have charged Antero for lost-in-hole liability-reduction protection (despite Antero requesting and paying for that protection over three years). In sum, Antero asserts Directional One failed to compute the risk of lost or damaged equipment into its daily rate for drilling services and should be forced to bear any liability in this case.

We note, however, that the MSA does not discuss a "daily rate" for services as Antero claims. Rather, the MSA says Antero would pay "compensation" according to Directional One's "published schedule of rates and/or prices," and would also pay for

22

"tools" and "equipment." The MSA further provides that Directional One must incorporate "charges for materials or supplies furnished by Directional One . . . for use in the Work" into its rate sheets. The record establishes that Directional One *did* incorporate the risk of lost-in-hole or damaged equipment in its published rate sheets, and it provided "rates and/or prices" payable by Antero for the tools and equipment lost or damaged while in Antero's possession and control. Directional One's rate sheets also incorporated the risk when they offered Antero the option to pay extra fees that would, in return, reduce Antero's cost of any lost-in-hole equipment by 50%, but Antero deliberately chose not to exercise that option. We see no error in the circuit court's conclusion that Directional One was permitted by the MSA to seek compensation for both lost tools and equipment in addition to its labor and expertise. The analogy proffered by Antero for electricians, plumbers and carpenters does not apply here: Antero did not hire Directional One solely for its expertise, but for its specialized equipment that was used by Antero (or its agents) at the bottom end of Antero's drill string. If a carpenter works at a customer's house, and the customer takes custody of, uses, and destroys the carpenter's drill, then the carpenter surely has a right to recover the cost of the drill.

Another argument made by Antero is that the MSA required Directional One to purchase first-party property insurance for its equipment and, hence, the MSA placed responsibility for lost equipment and tools squarely on Directional One. The MSA required Directional One to carry, "at its own cost and expense (including deductibles)," property insurance "covering (for its full value) the property, equipment, tool[s], and equipment of

23

[Directional One] that is used in the Work." Antero points out that the MSA required that Directional One's rates "shall be inclusive of . . . insurance premiums paid by [Directional One.]" Antero avers that the circuit court's ruling that Antero must pay for lost-in-hole equipment has rendered this language in the MSA meaningless.[14]

Directional One agrees that the MSA contained, in a general fashion, provisions that required Directional One to purchase property insurance and to bear the burden of lost or damaged property. However, Directional One points out that its rate

---

[14] Antero also touches on a provision of the MSA that required Directional One to "release, protect, defend, indemnify, and hold harmless" Antero against any claim regarding "damage to or loss of property of" Directional One. We have noted that such an anticipatory release "ordinarily covers only such matters as may fairly be said to have been within the contemplation of the parties at the time of its execution." *Murphy v. N. Am. River Runners, Inc.*, 186 W. Va. 310, 316-17, 412 S.E.2d 504, 510-11 (1991) (citations omitted). To the extent Antero claims it is entitled to indemnity for the lost-in-hole equipment, it could not have been within the contemplation of the parties when they executed the 2015 MSA for an obvious reason: over the year prior to its execution (and while the parties operated under the 2014 MSA), Antero had expressly requested the lost-in-hole liability-reduction protection in Directional One's rate sheets, paid for that protection, and then, on three separate occasions, paid Directional One for equipment and tools lost in hole (albeit at a reduced rate). On one occasion after executing the 2015 MSA, Antero paid in the same manner for lost-in-hole tools. Further, payment of lost-in-hole tools by well developers is standard in the industry, and MSAs in the record between Antero and other directional drilling contractors show it was Antero's standard practice.

Antero also posits that Directional One was merely a service provider, and that the MSA contemplated that Directional One would not provide any tools or equipment. We have, however, scrutinized both the 2014 and 2015 MSAs and find no language that defines, with any specificity, the "work" to be provided by Directional One. As we have previously noted, the "work" to be provided by Directional One includes "services, labor, experience, expertise, vehicles, equipment, supplies, tools, manufactured articles, materials, facilities, and/or goods (in whole and/or in part)[.]" The only specific delineation of tasks to be performed for Antero is found in Directional One's rate sheets.

24

sheets must be read together with the MSA. Because the rate sheets are more specific than the MSAs and contain terms that focus squarely upon Directional One equipment that Antero (or its agents) lost in hole, the specific language of the rate sheets qualifies the general language of the MSA. We agree.

Reading the MSA and rate sheets together as a whole, we find Antero's interpretation of the documents puts them in direct conflict. The duty of the circuit court was to "give meaning to every word, phrase and clause" of the parties' agreement and "also render all its provisions consistent and harmonious." Syllabus, *Henderson Dev. Co.*, 121 W.Va. at 284, 3 S.E.2d at 217. The MSA expressly requires Directional One to incorporate certain types of pricing into its rate sheets. For instance, the MSA requires Directional One to factor the "risks and hazards" of drilling and the "materials or supplies furnished" into its "compensation." These provisions of the contract cannot be ignored in favor of the insurance or indemnity provisions, as Antero claims. Instead, the provisions must be read in a consistent and harmonious fashion, and the circuit court achieved that goal by assessing the parties' three-year relationship. The record established that, in the business of directional gas drilling, liability for lost-in-hole equipment generally falls on the party who owns or operates the drill string, not the party that supplies the bottom hole assembly equipment. The circuit court fairly found that the parties' contract required that Directional One be responsible for and bear responsibility for insuring its tools and equipment when it had custody of them above the ground, but that Antero bear responsibility when it had custody of the tools and equipment and used them below ground. Additionally, there is

25

nothing in the record to suggest that Directional One negotiated for Antero's agreement to pay a range of prices arrayed in great detail in the rate sheets with the expectation that, at a later date, Antero would be free to ignore parts of those rate sheets at will. Services and equipment were provided by Directional One in expectation that Antero would pay the agreed upon rates of compensation, which included Antero paying for equipment that Antero (or its agents) lost or damaged at the end of a drill string.

Despite the blizzard of assertions put forth by Antero, we find no merit in them. Accordingly, we find no error in the circuit court's summary judgment rulings.

## IV. Conclusion

The circuit court's summary judgment rulings, in its orders dated August 19, 2019, as well as its final judgment order incorporating the jury's verdict in favor of Directional One, dated November 4, 2020, are affirmed.[15]

Affirmed.

---

[15] Directional One has requested that this Court award it the costs and attorneys' fees incurred in this appeal. However, a similar motion appears to be pending before the circuit court. Accordingly, we leave it to the circuit court to consider the propriety of this request.